[No. 30984.   Department One.   March 21, 1950.]

G. J. SIMONS, *Respondent*, v. STOKELY FOODS, INC.,
*Appellant.*[1]

[1]Reported in 216 P. (2d) 215.

*Halverson & Applegate,* for appellant.

*Tonkoff & Holst,* for respondent.

BEALS, J.—Plaintiff, G. J. Simons, is a farmer owning land near Mabton, Yakima county. The defendant, Stokely Foods, Inc., is a corporation organized pursuant to the laws of the state of Delaware, and for some years has been qualified to transact business within the state of Washington.

In his complaint, plaintiff alleged that, February 25, 1948, the parties to this action executed a written contract whereby the defendant agreed to purchase from plaintiff a crop of peas, to be planted by plaintiff on twenty-three acres of his farm; that the contract was prepared by the defendant; that the portion thereof pertaining to the harvesting of the peas was ambiguous; and that, at the time of the execution of the contract, it was orally agreed between the parties, which oral agreement was again made June 15, 1948, that the defendant would furnish certain harvesting equipment, consisting of machines known as a viner, a swather, and a loader, to be used in harvesting the crop.

Plaintiff also alleged that it was the custom of the neighborhood that the purchaser of peas from growers would furnish the growers with such equipment at the time of harvest; that the peas which plaintiff agreed, by the contract, to grow and sell to the defendant were ready for harvest on or about June 15, 1948, and that defendant's representative at Mabton was notified of this fact, but that the defendant failed and refused to furnish any machines or equipment for the harvesting of the crop, and refused to accept delivery of approximately forty-six tons of peas grown by plaintiff pursuant to the contract, with the result that the crop was lost, to plaintiff's damage in the sum of $3,450.

Plaintiff then alleged that he sustained additional damage in the sum of $402.50 by reason of the acts of defendant which resulted in making it impossible for plaintiff to produce fifty-seven and one-half tons of ensilage, which would have been produced after the harvest of the peas, and that he suffered further damage in the sum of twenty-three hundred dollars by reason of defendant's acts, as, if the peas had been harvested, plaintiff could have planted corn for ensilage and produced a crop which would have been worth the sum last mentioned.

Plaintiff prayed for judgment in the sum of $6,152.50 and for costs.

By its answer, the defendant admitted the execution of the contract, but denied the existence of any custom or any ancillary oral agreements in connection therewith, and denied any liability to plaintiff. The defendant also denied that the contract was in any particular ambiguous.

By way of a cross-complaint, defendant alleged its corporate existence, and the execution of the contract (wherein plaintiff was referred to as seller and defendant as buyer) which contained, *inter alia*, the following: "The SELLER agrees to plant, cultivate, harvest and deliver" the peas to the buyer, and provided

". . . that harvesting of said crops shall be done in accordance with the terms of this Contract, and that all of these matters shall be subject to the approval and satisfaction of the said BUYER or BUYER's representative. Should the SELLER fail to do any of the above mentioned work to BUYER's satisfaction after being notified by the BUYER to do so, the BUYER shall have the right to enter upon the premises and do any planting, cultivating, irrigating when necessary, weeding or harvesting of the above mentioned crop, and all costs thereof shall be charged to the SELLER and may be deducted from the amounts due him for peas accepted hereunder or otherwise collected, or BUYER may refuse delivery entirely and cancel this Contract."

The contract further provided that the crop "shall be harvested so as to be free from dirt, clods or weeds and to be placed on wagons or trucks as directed and promptly hauled to viner stations."

The defendant further pleaded that it had furnished the seed, delivered fertilizer for use on the crop, and had "dusted" the crop when necessary; that the value of the items furnished was $812.34; and that the plaintiff had failed to properly irrigate and cultivate the crop, had refused to harvest the crop and deliver the peas to defendant, and had failed to perform the contract.

Defendant prayed for dismissal of the action, and that it have judgment against plaintiff for $812.34.

By his reply, plaintiff denied the affirmative allegations of the answer and cross-complaint.

The cause was tried to a jury, which returned a verdict in plaintiff's favor in the sum of $2,554.42 (by its answers to special interrogatories, the jury stated that it found in defendant's favor upon the third item of alleged damage), and a verdict in favor of the defendant, on its cross-complaint, in the sum of $812.34.

Defendant's motion for judgment in its favor notwithstanding the verdicts or, in the alternative, for a new trial having been denied, judgment was entered upon the verdicts, resulting in a net judgment in favor of plaintiff and against the defendant in the sum of $1,742.08, together with costs, from which judgment the defendant has appealed.

Appellant assigns error upon the refusal of the trial court to sustain appellant's objections to the admission of evidence offered by respondent concerning customs and usages prevalent in the district in which the farm was situated; upon the giving of certain instructions to the jury, to which appellant excepted; and upon the refusal of the trial court to give other instructions which appellant requested. Appellant also assigns error upon the admission of certain evidence, over appellant's objection; upon the entry of judgment in respondent's favor; upon the refusal of the trial court to grant appellant's motion for judgment in its favor notwithstanding the verdicts or, in the alternative, for a new trial, and, finally, upon the entry of the judgment from which appellant has appealed.

From the evidence, it appears that respondent owns a tract of land near Mabton, where he engages in diversified farming. Appellant corporation is engaged in the business of freezing and canning peas for the market, and maintains a branch plant at Zillah for that purpose.

Respondent had never grown peas for freezing until 1948, when he discussed the matter with an agent of appellant, who agreed to furnish the seed. Respondent planned to grow peas upon a portion of his farm for the purpose of harvesting a double crop, the first crop for the freezing market and the second for ensilage for his cattle.

N. B. Strew, a field man in the employ of appellant, visited respondent's farm February 25, 1948, and, on that occasion, the written contract between the parties was executed. Mr. Strew had been in appellant's employ for about eight years, part of his duties consisting of supervising the growing and harvesting of crops which the farmers had agreed to sell to appellant.

Respondent planted the peas, according to instructions from appellant, during a period of several weeks, in order that the crop would not all mature at once, and was furnished with seed and a drill for the planting by appellant corporation, which also provided fertilizer for the crop and attended to the necessary "dusting," appropriate charges being entered against respondent. This was the customary procedure followed by appellant in carrying out its contracts for crops of peas with more than twenty-five farmers in the Yakima valley.

When, in respondent's opinion, the crop was ready for harvesting, he personally notified Strew, the evidence being somewhat in dispute as to what was said during this conversation. Respondent testified that Strew told him that appellant would send to respondent's farm a swather (used to cut the pea vines) and a loader (used to pick up and load the cut vines for transportation to the viner, a machine which removes the pods from the vines and shells the peas); while Strew testified that he informed respondent that the

latter could use a swather and loader which, at that time, were in place on a nearby farm.

The two machines referred to are especially adapted to the harvesting of peas, making the harvesting of that crop easier and more expeditious. Several of these machines belonging to appellant were in the vicinity at the time, and, while the use of machines in harvesting a crop of peas is not essential, the work may be accomplished better and much more speedily with their aid.

Apparently, the crop matured approximately June 20th to 24th, and, no machines having been made available to respondent, as he testified, none were used. Respondent's crop was harvested several weeks later, with the aid of an ordinary mower which respondent purchased. At the time of this harvest, the peas were no longer fit for freezing, the period during which they may be frozen being not over forty-eight hours after the crop reaches a certain stage of maturity.

Late in June, respondent had called upon the manager of appellant's plant at Zillah and asked him what appellant intended to do about the crop. The manager informed him that it was too late to harvest the peas for freezing, and suggested that respondent allow them to go to seed. This respondent refused to do, and eventually he sold the crop for cattle feed.

The trial court, over repeated objections by appellant's counsel, allowed respondent to introduce evidence before the jury that tended to show a local custom to the effect that, under a contract such as that between the parties to this action, appellant was obligated to furnish to the farmer certain machines, referred to as a swather, a loader, and a viner, to use in harvesting the peas.

It was and is appellant's contention that, by the contract between the parties, when respondent agreed to "plant, cultivate, harvest and deliver" the peas to appellant, he assumed the obligation of himself harvesting the crop, and was not entitled to call upon appellant to furnish the machines referred to, to use in connection with the harvest.

The contract contains no provision to the effect that appellant assumed the obligation of furnishing respondent with any harvesting machines whatsoever. Appellant contends that the evidence, hereinafter referred to, which was admitted by the trial court, tended to vary the words of the written contract which were clear, comprehensive, and unambiguous, and that the word "harvest," as contained in the portion of the contract above referred to, obligated respondent to himself provide any necessary machines or equipment. By the terms of the contract, appellant agreed to make available to respondent the machine referred to as a "viner," but the contract contains no mention of the other two machines.

Mr. Strew testified that he knew that respondent had no swather, loader, or viner, and that, at the time he signed the contract on behalf of appellant, he intended to furnish the viner, that machine coming into play after the harvest has proceeded beyond the point where a swather and loader are useful.

It appeared that no farmer in the vicinity owned any of the harvesting equipment above referred to, and that there were two corporations which bought peas for freezing in the area, namely, appellant, and another referred to as Cal-Pack. In the latter company's contracts, the purchaser agreed to harvest the crop for the grower at a certain cost per acre; while it appears that, for three years prior to 1948, appellant had furnished to its growers the swathers and loaders for harvest purposes, as well as making available to them the machine known as a viner. Appellant had acquired these machines, which operate together, one being complementary to the other, and loaned them to its growers. Out of approximately thirty growers who, in 1948, contracted to sell their peas to appellant, about twenty were furnished with these machines for use in harvesting the peas, and, apparently, those were the only growers from whom appellant received any peas during that season.

The trial court was of the opinion that the evidence offered by respondent was admissible for the purpose of

showing a recognized custom to the effect that appellant would furnish the machines for the farmers to use in harvesting the peas.

Witnesses called by respondent testified that they had contracted to sell their peas to appellant, and that appellant had furnished them with the appliances referred to, to use in harvesting their crops. Several of these witnesses testified that, while the contract did not so provide, it was "understood" or had become the "custom" that appellant would furnish these appliances to the farmers.

Appellant, of course, relies upon the general rule that evidence will not be admitted to vary the plain meaning of a written contract, and argues that the phrase "to harvest," contained in the contract, necessarily implies that the grower will himself provide all necessary equipment to accomplish the harvest.

As above stated, the contract between the parties did not provide that appellant would furnish equipment for the use of respondent in harvesting the crop; but it clearly appears that harvesting the peas without the aid of the machines above referred to would be difficult and expensive, and would require more time than harvesting with their aid. Appellant did furnish respondent with a drill to use in planting the crop.

The construction of the contract presented to the trial court an important legal question. The following texts are of interest in connection with this question:

"Usage may be important in three different aspects:

"(1)  To aid in the interpretation of the meaning of the express language of an agreement, or the meaning of the parties' other manifestations of intention;

"(2)  To annex terms to the agreement in accordance with the usage, provided they are consistent with the express language or other manifestations of intention, though they may contradict or vary implications which otherwise would be drawn from the written or oral expression of the parties;

"(3)  To make inapplicable to an agreement rules of law otherwise applicable." 3 Williston on Contracts (Rev. ed.) 1871, § 648.

" . . . Where construction or interpretation of a written instrument is involved, the primary purpose in permitting parol evidence of a custom to be introduced is to enable the court to arrive at the real meaning and intention of the parties, but such evidence is only permissible in cases where the intent cannot be ascertained from the terms of the contract." 55 Am. Jur. 288, § 27.

" . . . Evidence of custom or usage is admissible to explain the meaning of words and phrases used and to annex to such contract certain incidents which circumstances indicate the parties intended to annex when the words they have used do not necessarily exclude the operation of such custom or usage." 55 Am. Jur. 291, § 30.

"*b*. The principle under which provisions are annexed to written contracts by usage is the same as that which controls the admission of collateral parol agreements, but usage is sometime operative though an express agreement to the same effect would not be. The test in both cases is the practical one, whether a reasonable contracting party might enter into the written contract in question and have intended to be bound both by its express terms, and also by the terms of the usage or collateral parol agreement in question. Concrete cases seem to indicate that reasonable persons are much more likely to rely on a recognized usage to affect the otherwise natural implications of their written contracts than on collateral parol agreements.

"*c*. In a certain sense every material incident which is added to a written contract varies it, makes it different from what it appears to be, and so far is inconsistent with it. If by the side of the written contract without the added incident is written the same contract with the added incident the two would involve different obligations and be different contracts. The principle on which the evidence is admissible is that the parties have not set down on paper the whole of their contract in all its terms, but those only which were necessary to be determined in the particular case by specific words (these of course may vary infinitely), leaving to implication and tacit understanding all those general and unvarying incidents which a uniform usage annexes, and according to which they must naturally be understood to contract, unless they expressly exclude them." 1 Restatement of the Law of Contracts 347, § 246.

It must be borne in mind that no farmer in the vicinity owned a swather or a loader, and that appellant was

aware of this fact. Appellant's agent, Mr. Strew, testified that, at the time he signed the contract on appellant's behalf with respondent, he anticipated that appellant would furnish respondent with the equipment to use in harvesting the crop "if we can," and there can be no question that, in 1948, appellant did furnish such equipment to many of the farmers with whom it had contracts similar to that with respondent. It is, of course, clear that, when respondent signed the contract, it was not his intention to provide himself with the equipment referred to, and it is evident that he assumed that appellant would furnish the machines for the harvest.

In 3 Williston on Contracts (Rev. ed.) 1881, § 652, the author quotes from the English case of *Hutton v. Warren,* 1 M. & W. 466, 150 Eng. Rep. 517, the following:

" 'It has long been settled, that, in commercial transactions, extrinsic evidence of custom and usage is admissible to annex incidents to written contracts, in matters with respect to which they are silent. The same rule has also been applied to contracts in other transactions of life, in which known usages have been established and prevailed; and this has been done upon the principle of presumption that, in such transactions, the parties did not mean to express in writing the whole of the contract by which they intended to be bound, but a contract with reference to those known usages.' "

This court, in the case of *Williams v. Ninemire,* 23 Wash. 393, 63 Pac. 534, said:

"It is only where a contract is silent in some particular or is ambiguous that proof of custom is admissible, and such proof is then admissible only for the purpose of finding out what the contract really was, and not to overthrow it. Proof of custom is received in such cases upon the assumption that, as to those matters not covered by express stipulations in the agreement, the parties are presumed to have made their contract with reference to the established custom and usage of that place; and these the law will incorporate into the contract, in order to explain or complete it."

The case cited was quoted with approval in *Wilkins v. Kessinger,* 90 Wash. 447, 156 Pac. 389, but was held inapplicable because no custom had been pleaded.

In the case of *Strong v. Ringle*, 96 Kan. 573, 575, 152 Pac. 631, the court quoted from *Robinson v. United States*, 80 U. S. 363, 20 L. Ed. 653, the following:

" 'Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary.' "

The cases of *City of Philadelphia v. Lieberman*, 112 F. (2d) 424, and *Holmes v. Whitaker*, 23 Ore. 319, 31 Pac. 705, are also of interest in this connection.

The supreme court of California, in the case of *Ermolieff v. R. K. O. Radio Pictures*, 19 Cal. (2d) 543, 122 P. (2d) 3, in determining a question involving the meaning of the phrase "The United Kingdom," in a contract giving the right to exhibit a motion picture in "The United Kingdom," held that the defendant had the right to exhibit the picture in Eire (or the Irish Free State), although it was stipulated that Eire was not a part of "The United Kingdom," and that the defendant had no right to exhibit the picture in any country not named in the contract. Evidence had been admitted before the trial court to the effect that, in the motion picture industry, Eire was considered as a portion of the United Kingdom. The trial court, on motion, struck this evidence and granted judgment in favor of the plaintiff. The supreme court reversed the lower court and remanded the case for a new trial. In the course of the opinion, the court said:

"The fact that it is expressly stipulated in the contract that defendant has no rights in any countries not named in the exhibit, does not alter the situation. It falls short of being tantamount to an express and direct agreement that Eire shall not be considered as included in The United Kingdom. The door is still open to evidence of custom and usage with reference to the scope of The United Kingdom.

"Plaintiff urges that since judicial notice may be taken and it was stipulated that Eire is independent of The United Kingdom and not a part thereof, the custom and usage evidence is not admissible to contradict that stipulation or notice. That notice and stipulation add nothing material to the situation. In any case where a word in a contract had an

unquestioned common meaning there could be no dispute as to that common meaning, but the custom and usage is evidence of the peculiar sense in which it was used. The stipulation would add nothing that was not already plain on the face of the contract."

In the case of *Body-Steffner Co. v. Flotill Products*, 63 Cal. App. (2d) 555, 147 P. (2d) 84, a judgment rendered by the superior court in favor of the plaintiff was reversed. It appeared that the parties had entered into several contracts whereby the defendant had agreed to deliver to the plaintiff canned tomatoes and tomato paste. Most of the contracts had been prepared upon a standard printed contract of purchase and sale form, containing a reference to an attached multigraphed sheet dealing with certain contingencies that might arise out of the then existing war emergency. The court of appeals considered the multigraphed sheet as a portion of the contract. In the printed form, the name of the purchaser was typed as " 'B. H. Body, Inc. As Agents,' " and immediately following, after the printed word " 'Remarks,' " were typed the words " 'Brokerage 5% B. H. Body, Inc.' " It was admitted that the purchaser named in the contract was the same corporation as the plaintiff in the action. There were other contracts between the parties, somewhat different in form but in effect the same.

The defendant having failed to deliver certain of the merchandise called for by the contracts, the plaintiff sued and recovered judgment before the superior court, upon the theory that all of the contracts were contracts of purchase and sale. On appeal, the appellant (defendant in the action) contended that the contracts were, in fact, contracts of brokerage or agency, and offered evidence to the effect that it was an accepted usage and custom in the trade to use the standard form of purchase and sale contract in cases providing for both sales and agencies. The evidence offered was rejected by the trial court, and for this reason the judgment appealed from was reversed. In the course of the opinion, the court said:

"It is a rule of practically universal acceptation in common law jurisdictions that however clear and unambiguous the words of a particular contract may appear on its face it is always open to the parties to the contract to prove that by the general and accepted usage of the trade or business in which both parties are engaged and to which the contract applies the words have acquired a meaning different from their ordinary and popular sense. [Citing many authorities.]"

The court of appeals strongly relied upon the case of *Ermolieff v. R. K. O. Radio Pictures, supra,* quoting from that opinion the following:

" 'Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense.' "

A petition to the supreme court of California for a hearing was, by that court, denied.

In the case at bar, the trial court did not err in admitting the evidence of which appellant complains and in submitting to the jury questions of fact to be considered by the jury in connection with the phase of the case referred to above.

█ Appellant excepted to and assigns error upon the court's instruction No. 7, which reads as follows:

"You are instructed that the contract does not require the defendant to furnish the plaintiff with a swather and loader, and therefore in order to find that defendant was obligated to provide plaintiff with a swather and loader, you must find the existence of a custom to do so under the evidence and in accordance with these instructions."

For the reasons above stated, this assignment of error is without merit.

Appellant assigns error upon the refusal of the trial court to give certain proposed instructions requested by appellant, by which requests appellant sought to have the jury instructed that the contract between the parties was clear and free from ambiguity, and that respondent's claim that

appellant was obligated by custom to furnish respondent with a swather and loader should not be considered.

The trial court did not err in refusing to give these instructions.

█ Appellant assigns error upon the court's instruction No. 5, which reads as follows:

"You are instructed that such of plaintiff's allegations that are admitted by the defendant you must accept as true and that the plaintiff is not required to produce any evidence to prove such allegations. In this respect I instruct you that the defendant admits that it is a corporation organized under the laws of Delaware and is qualified to transact business within the State of Washington and is now transacting business here and that all of its license fees have been paid.

"Defendant further admits that the plaintiff and defendant, on or about the 25th day of February, 1948, entered into a contract concerning peas, which has been admitted in evidence, and, further, that the plaintiff did plant 23 acres of peas. It is further admitted by defendant that it did not take delivery of said peas."

As stated by appellant in its brief, this instruction referred to certain admissions made by appellant in its pleadings. Appellant's exception to this instruction reads as follows:

"Comes now the defendant and excepts to Instruction No. 5, for the reason that it does not specify or require the plaintiff to make delivery of peas in accordance with the terms of the contract, and does not instruct the jury that the plaintiff was obligated to make delivery of the peas in accordance with the terms of the contract before the defendant was required to take delivery of said peas; and for the further reason that it does not instruct the jury that plaintiff must either deliver or offer to deliver peas unless the plaintiff is excused therefrom by acts or conduct of the defendant."

Of course, all of the evidence was to the effect that the peas were never delivered to appellant, its counsel arguing that the instruction, in effect, amounts to the court telling the jury that respondent tendered delivery and that appellant "did not take delivery," and fails to instruct or distin-

guish for the jury that respondent agreed, under the contract, " 'to deliver the peas' but did not do so."

The contract was before the jury, and the evidence showed beyond question that the crop was not harvested in time to render the peas suitable for freezing or canning, and all of the evidence was to the effect that the peas were never delivered to appellant. The instruction could not have been construed by the jury as argued by appellant or considered by the jury to appellant's prejudice. This assignment of error is without merit.

■ Appellant contends that, even if it be assumed for the sake of argument that the contract between the parties was so worded as to permit the introduction of parol evidence concerning custom, in connection with the construction of the word "harvest," the evidence received was insufficient in that it did not show that the custom was "unvarying and universal" and sufficient to support a finding by the jury in respondent's favor.

The evidence concerning custom showed beyond question that appellant, in dealing with the farmers in the locality, had itself recognized (and, indeed, established) the custom. This contention of appellant's is without merit.

Appellant cites 55 Am. Jur. 271, § 10, which states the principle of law that

"One of the essential elements which a usage or custom must possess before it can be said to be legally binding upon, and enforceable in law against, one who does not have actual knowledge of it or has not in fact been assented thereto is that which specifies that the custom must be certain, continuous, and uniform. It must be so uniform that the parties concerned must be presumed to have known of the custom and acted in reference to it, or, as has been said, so fixed that those engaged in the business may know what to meet. Conversely, lack of definiteness is fatal to the existence of a custom; hence, evidence of a loose usage for an indefinite period, limited to a few persons in one particular locality, will not suffice in a court of law."

In the case at bar, as above stated, appellant had knowledge of the custom, having itself followed and recognized it for several years in the locality in question.

Appellant admits that, from the evidence before it, "the jury could find that the defendant furnished swathers and loaders to most of its growers for a period of the past three years," arguing that the equipment had not been furnished to all of its contract growers but only as an accommodation, when the equipment was available, to those who desired it, at a small rental charge.

The ruling of the trial court in connection with the custom referred to is supported by the law and the evidence.

Appellant excepted to the court's instruction No. 8, which reads as follows:

"You are instructed that a custom or usage, as known to the law, is a common practice and understanding which is the result of a long series of actions constantly repeated, which have by such repetition and by continuous acquiescence acquired the force of a tacit and common consent. Custom is not established by a single act and may not be established by one or several repetitions of the same act; but in order to establish a custom the practice must have been so uniform and repeated so many times and for such a length of time that it has become commonly understood that the practice has become uniform and will be regularly followed, unless the contrary is agreed to."

This instruction is attacked upon the ground that "A custom must be such that all people similarly situated observe the custom, i. e., it must be uniformly prevalent and universally observed."

In the case at bar, the custom in question was a local one, established and followed by appellant in connection with contracts similar to its contract with respondent. The other company engaged in a similar business in the vicinity (California Packing Company) followed an entirely different system in connection with the peas which it purchased from the farmers. As above stated, that company itself harvested the peas with its own equipment for an agreed price.

Appellant also argues that evidence introduced by respondent concerning the grade of the crop raised by him was insufficient to support the jury's verdict, as the con-

tract provided that appellant should pay for the peas only after they had been accepted and graded by appellant.

We find no error in the court's instructions upon this phase of the case.

Appellant also assigns error upon the court's instruction No. 10, but, in its brief, ignores this assignment.

Error is assigned upon the court's instruction No. 12, and upon the refusal of the court to give appellant's proposed instruction No. 8. In connection with the latter portion of the assignment, appellant apparently argues that its proposed instruction No. 9 should have been given.

The court's instruction No. 12, concerning the measure of damages in case the jury should find in respondent's favor, was free from error, and the court did not err in refusing to give the instructions requested by appellant.

By assignment of error No. 6, appellant contends that the verdict of the jury in respondent's favor, upon the cause of action based upon loss of pea ensilage, was excessive.

In his complaint, respondent alleged, in connection with this phase of the case, that he suffered damage in the sum of $402.50. The jury, in answering special interrogatory No. 2 submitted by the court, fixed respondent's damage as to this item in the sum of $483.

It does not appear from the record before us that appellant called the attention of the trial court to the fact that the jury had returned a verdict in respondent's favor, in connection with the item above referred to, in excess of the amount which respondent demanded in his complaint, and somewhat in excess of any amount which the jury, under the evidence, could have awarded to respondent upon this item. Had appellant called this matter to the attention of the trial court prior to the entry of the judgment appealed from, it would seem probable that the matter would have been then corrected.

It does not appear from the record that respondent ever asked to amend his complaint by increasing the demand

for judgment in connection with the pea ensilage, even to the small extent which the evidence might have permitted.

Upon remand, the judgment in respondent's favor will be reduced by the sum of $80.50. So reduced, the judgment appealed from is affirmed.

Respondent will recover costs in this court.

SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.

SIMPSON, C. J., dissents.