[No. 534-1.    Division One—Panel 2.    November 22, 1971.]

RICHARD T. STENDER, *Appellant*, v. TWIN CITY FOODS, INC.,
*Respondent.*

*Boynton Kamb* and *John G. Kamb,* for appellant.

*Halverson, Applegate, McDonald, Bond, Grahn & Wiehl*
and *F. N. Halverson,* for respondent.

PEARSON, J.—This is an action for breach of contract in which the plaintiff-appellant, Richard T. Stender, a pea grower, was denied recovery by the trial court against defendant, Twin City Foods, Inc., a food processor.

The contract in question for 1968 required plaintiff to plant, fertilize, and cultivate 120 acres of "Perfection" peas, the seed of which was supplied by defendant. Twin City Foods, Inc. was required to harvest and vine the peas at proper maturity and pay a stipulated price, depending upon the quality of tenderness of the peas.

The planting under the contract was made in two stages, in late April and in early May, so that the entire acreage would not mature at once. It was undisputed that the first planting of 55 acres came to maturity and was properly harvested by defendant on July 23, 1968.

However, plaintiff's claim centers around 63 acres of the remaining 65-acre[1] second planting which defendant admittedly did not harvest, although the planting was ready for harvest between July 27 and August 2. Defendant's excuse for nonperformance was based upon part 5, section 1 of the contract, which provided:

> In the event of circumstances resulting from *adverse weather conditions*, mechanical failures or other means, that may delay harvest of the green pea crop beyond the optimum maturity for processing, Twin City has the option to divert that portion of Grower's acreage for seed or feed purposes as the quality of the salvage may dictate.

(Italics ours.)

This clause constitutes an express condition subsequent, limiting defendant's duty to perform in the event the condition happened. *See Fleming v. August,* 48 Wn.2d 131, 291 P.2d 639 (1955). Consequently, defendant had the burden of proof on the issue. Plaintiff contends this burden was not met.

Defendant introduced testimony of its own employees, as well as other experts in both the pea growing and processing industry, who testified that unseasonably cool weather

---

[1] Two acres were diseased by wilt.

(daytime temperature in the 60° range) in mid-July, followed by warm weather in late July (daytime temperature in the 80's), caused much of the pea crops to mature at once. Defendant's witnesses then testified that because of contract commitments to other growers, it did not have sufficient vining machines (even though committing 28 machines more than it ordinarily used) in the area to handle all of the peas which were ready for harvest at the same time. Consequently, it was necessary to bypass plaintiff's 63 acres, along with acreage of other growers.

The testimony showed that defendant staggered plantings with plaintiff and other growers in 1968, as it had in prior years, to prevent an excessive amount of simultaneous maturing of the crops. However, no planting schedules other than plaintiff's were offered in evidence, nor did defendant show that its planting schedules for prior years, in which no bypassing of crops was required, corresponded with its planting schedules for 1968. The testimony did show that in 1968 defendant contracted for 12,200 acres of peas, which was 200 more acres than it had harvested in 1967, and that it bypassed approximately 600 acres in 1968, including plaintiff's 63 acres.

There was no testimony that "adverse weather" per se affected the quality of the crop, or that "adverse weather" prevented the harvest of plaintiff's crop when it had reached optimum maturity. There was likewise no testimony that the "adverse weather" bypass clause was by custom of the industry interpreted in light of the total contract commitments of the processors, nor was there any evidence of the custom of the industry with reference to how much acreage was normally contracted for by a processor in light of its capacity to harvest. There was also an absence of evidence that defendant in 1968 had contracted for a normal and usual amount of acreage in light of its equipment capacity. Defendant concedes its contractual obligation to pay $105 per acre for the bypassed acreage.

The contract, a mimeographed form prepared by defendant, contains no definition of the term "adverse weather

conditions" and, except for the following provision, does not refer to defendant's contract commitments for 1968 with other growers.

In Twin City scheduling of time for cutting and delivery, Twin City does not guarantee selection of most desirable time for maximum return of grade or tonnage and is obligated only to schedule crops in good faith for efficient harvesting and handling of the crop contracted hereby and by other similar contracts with other growers.

The issue presented is whether or not there was sufficient evidence for the trial court to find that the "adverse weather" condition was met, so as to excuse defendant's duty to perform its contractual obligation to harvest plaintiff's pea crop.

It is axiomatic that the primary goal in construing the terms or conditions of a contract is to ascertain the bilateral intention of the parties at the time of contracting. *Dennis v. Southworth*, 2 Wn. App. 115, 467 P.2d 330 (1970); *Eagle Ins. Co. v. Albright*, 3 Wn. App. 256, 474 P.2d 920 (1970); *Grant County Constrs. v. E. V. Lane Corp.*, 77 Wn.2d 110, 459 P.2d 947 (1969).

The trial court, in holding in favor of defendant, construed the phrase *"adverse weather conditions . . . that may delay harvest of the green pea crop beyond the optimum maturity for processing"* to mean weather conditions which caused too many acres of green peas to reach optimum maturity at one time, so that defendant's facilities were not adequate to accommodate all of its contract commitments.

We think such a construction was not warranted from the evidence as to the bilateral intention of the parties at the time of contracting, nor does such a construction give effect to the plain meaning of the disputed clause, nor is it consonant with other rules of construction normally used as aids to ascertaining the bilateral meaning intended.

Defendant's proof went no further than to show that the July weather in 1968 was variable,[2] causing more simultaneous ripening of the pea crops than its facilities would handle.[3] Defendant's field manager, Robert D. Murphy, did testify that despite the "adverse weather" his company was able to harvest its full quota of peas for 1968.

If the phrase "adverse weather conditions" were to have such an unusual meaning, it seems to us that such a specific meaning could have been included in the contract or established as the well-known meaning of the term by the industry. This is particularly true where the urged construction leaves the grower's chances of a successful harvest dependent not only upon favorable weather conditions, but also dependent upon *how much* acreage the processor has contracted with other growers and *which* acreage the processor chooses to harvest, where weather conditions are less than ideal.

■ We conclude from our review of the record that while there was substantial evidence that variable weather in July caused too much simultaneous ripening of the crops for defendant to harvest, there was not substantial evi-

---

[2]The maximum and minimum temperatures from July 12 through August 2, 1968 were as follows:

|  | Max. | Min. |  | Max. | Min. |
|---|---|---|---|---|---|
| July 12 | 66° | 53° | July 23 | 74° | 45° |
| 13 | 70° | 50° | 24 | 76° | 49° |
| 14 | 66° | 54° | 25 | 77° | 50° |
| 15 | 69° | 53° | 26 | 80° | 50° |
| 16 | 71° | 45° | 27 | 83° | 50° |
| 17 | 74° | 49° | 28 | 81° | 51° |
| 18 | 76° | 52° | 29 | 78° | 50° |
| 19 | 60° | 53° | 30 | 83° | 49° |
| 20 | 69° | 54° | 31 | 88° | 50° |
| 21 | 70° | 45° | Aug. 1 | 88° | 48° |
| 22 | 72° | 47° | 2 | 80° | 50° |

[3]By way of contrast, John Denton, field manager for Cedargreen Foods, called as an expert witness by plaintiff, testified that in 1968 his company contracted for 3,600 acres of peas in the same general area, bypassed none of such acreage, and "had the best year in the history of our company" in the quality of the harvest.

dence that at the time of contracting the bilateral intention of the parties as evidenced by custom of the industry was to attribute such a meaning to the term "adverse weather conditions." It is our further view that in the context of contract interpretation of a specialized contract, as we have before us, reasonable industry custom and usage should determine the meaning of doubtful language. *See* 3 A. Corbin, Contracts § 555 (1960).

■ The Supreme Court and the Court of Appeals, in numerous decisions, have enunciated the principles that words in a contract are given their usual and ordinary meaning, *Honeywell, Inc. v. Babcock*, 68 Wn.2d 239, 412 P.2d 511 (1966), unless sufficient reason exists to apply another meaning. *Patterson v. Bixby*, 58 Wn.2d 454, 364 P.2d 10 (1961); *Lee v. Ticehurst*, 2 Wn. App. 42, 466 P.2d 190 (1970).

■ The usual and ordinary meaning of "adverse weather" as that term applies to growing crops would be such weather as either affects the quality of the crop or prevents the harvest of it. At the very least, we think, "adverse weather" must render performance impossible under reasonable industry standards, in order to excuse performance. Merriam-Webster Third Int'l Dictionary (1969) at page 31 attributes a multitude of meanings to the word "adverse," but generally defines it as an adjective describing what is unfavorable, harmful, difficult or detrimental. Where, as here, the weather neither affects the quality of the crop nor prevents the harvest of it, we cannot perceive how it could be deemed adverse, absent a showing that the weather itself placed performance beyond defendant's control. To read into such term defendant's ability to perform in light of other contract commitments, absent well-established industry custom, would place the grower completely at the mercy of the processor's skill in predicting before the crops are planted how much can be harvested if weather conditions are favorable and places the risk on the grower, not only of weather that is less than ideal, but also on the number of vining machines defendant

has to apply to a given area and what volume of acreage the processor chooses to contract.

Likewise, the language of a contract should be given the meaning which best gives effect to the bilateral intention of the parties, *Patterson v. Bixby, supra,* and where one construction would make the contract unreasonable or such that the prudent person would ordinarily not contract, but another interpretation, equally consistent with the language, would make it reasonable, fair, and just, the latter interpretation should control. *See Dickson v. Hausman,* 68 Wn.2d 368, 413 P.2d 378 (1966).

It seems to us unreasonable and unfair to plaintiff to construe rather typical July weather to be *adverse,* simply because several days of cool weather in mid-July and several days of warm weather in late July caused multiple crops of multiple growers to mature in such close proximity in time so as to overextend defendant's harvesting facilities, absent evidence that such meaning was the known and customary meaning of the industry.

Accordingly, it is our view that defendant failed to sustain the burden of proof, so as to excuse its duty to harvest 63 acres of plaintiff's crop.

The judgment is reversed and remanded for a determination of plaintiff's damages for breach of contract.

JAMES, J., concurs.

FARRIS, A.C.J. (dissenting)—The record establishes that the number of peas ready for harvest at "the time of optimum maturity for processing" exceeded the expectations of the processor. The trial court found that the reason for the excess was adverse weather conditions. Appellant argued below and here that adverse weather conditions for the purpose of the agreement meant storm, rain or inclement weather necessitating a shutdown of the pea harvest. The trial court rejected this contention and found as a fact:

> That adverse weather conditions existed at the time the defendant elected to bypass the plaintiff's 63 acres of peas, and such adverse weather conditions were the sole

cause of the defendant electing to bypass the same. That the adverse weather conditions consisted of an unusual, unexpected and severe fluctuation of ambient temperatures which prevented the routine scheduled maturing of the entire pea crop under contract to defendant, of which entire crop plaintiff's 63 acres constituted a part. That in the period from July 12-20, 1968, the ambient temperatures were lower than normal, generally in the 60° range which had the effect of retarding maturation of the peas. That from July 21-25, 1968, the ambient temperatures gradually increased, which started the peas "moving" toward maturity. That from July 26-August 2, 1968, the ambient temperatures increased rapidly and substantially, into the 80° range, which snapped all the peas to maximum maturity at the same time, rather than on the scheduled chronological series of ripening and maturity as had been planned and expected. That as all the peas ripened and matured within an extremely short period of time, rather than in a normal, staggered basis, the defendant was unable to harvest all the peas of all its pea growers who had contracts with the defendant, and defendant accordingly, and with cause under the subject contract, elected to bypass some peas, including the 63 acres of the plaintiff.

Finding 8. There is substantial evidence in the record to support this finding. It should not be disturbed on appeal. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

The majority is persuaded by appellant's argument that the bypass was an arbitrary selection made simply because the defendant did not have enough viners to take care of the crops. The record supports the trial court's conclusion that the reason the defendant did not have enough viners to take care of the crops is that the weather conditions increased the size of the crops ready for processing beyond any reasonable expectations.

The language of the contract obligates both parties to make a good faith effort to perform. The finding of fact of the trial court resolves any issue regarding the good faith effort of the defendant in his favor. The record indicates, and the majority acknowledges, that the defendant ob-

tained 28 additional viners in an effort to harvest the crop. I am unprepared to assume with the majority that the defendant could have reasonably obtained additional viners and harvested the entire crop. Furthermore, I do not agree with the majority that the finding of the trial court, if sustained, places on the grower the risk not only of adverse weather conditions, but also for the number of vining machines that the defendant has to apply to a given area and the volume of acreage for which the defendant chooses to contract. The only excuse for nonperformance is adverse weather conditions. The trial court, upon conflicting evidence, resolved this issue in favor of the defendant. The definition of adverse weather condition must be construed in light of reasonable industry custom and usage. The contract provided for payment for peas whose harvest is delayed by adverse weather conditions beyond the optimum maturity for processing. Payment was made to the plaintiff according to this bypass provision of his contract.

The judgment should be affirmed.

Petition for rehearing denied January 10, 1972.

Appealed to Supreme Court January 14, 1972.