[No. 42265.   En Banc.   May 17, 1973.]

RICHARD T. STENDER, *Respondent*, v. TWIN CITY FOODS, INC.,
*Appellant*.

*F. N. Halverson* (of *Halverson, Applegate, McDonald,
Bond, Grahn & Wiehl*), for appellant.

*John G. Kamb* and *Boynton Kamb*, for respondent.

WRIGHT, J.—This is an action on an alleged breach of a written contract.

On March 9, 1968, the plaintiff, Richard T. Stender, a pea grower, entered into a written contract with the defendant, Twin City Foods, Inc., a food processor. This contract was a mimeographed form prepared by the defendant and signed by both parties.

Under the terms of the contract, the plaintiff was required to plant, fertilize and cultivate 120 acres of "Perfection" peas, the seed of which was supplied by the defendant. In turn, the defendant was obligated to harvest and vine the peas at their proper maturity and pay a stipulated price for them, depending upon the quality of tenderness of the peas.

The defendant executed similar contracts with other pea growers; and, having first planted peas in 1959, the plaintiff was an experienced grower with knowledge that the defendant executed these similar contracts.

Under the agreement, the defendant made an assignment of planting dates which were routinely staggered so that various seed crops would mature at different times, thus allowing the defendant to harvest the crops of all its contract growers in a systematic manner. The plaintiff was assigned April 28 and 29, 1968 as planting dates on a 55-acre tract and May 11 and 12, 1968 on a 65-acre tract.

Relative to the scheduling of crops, part 3, section 12 of the contract provides:

> In Twin City scheduling of time for cutting and delivery, Twin City does not guarantee selection of most desirable time for maximum return of grade or tonnage and is *obligated only to schedule crops in good faith for efficient harvesting and handling of the crop contracted hereby and by other similar contracts with other growers.*

(Italics ours.)

The first planting of the 55-acre tract came to maturity and was properly harvested and vined by the defendant on

July 23, 1968. Of the remaining 65-acre tract, there were 2 acres which were blighted by wilt, leaving 63 acres of peas which became ready for harvesting in the period between July 27 and August 2, 1968. At this time, this block of 63 acres was bypassed by the defendant and the peas were not harvested.

The plaintiff brought the present action to recover damages for the failure of the defendant to harvest and vine the peas on this acreage, and for improperly bypassing and leaving the peas in the field. The plaintiff sought to recover $251 per acre or $15,213, the amount which the plaintiff would have received if the crop had been harvested by the defendant.

Defendant's excuse for nonperformance in harvesting the peas was based upon part 5, section 1 of the contract, which provides:

> In the event of circumstances resulting from *adverse weather conditions,* mechanical failures or other means that may delay harvest of the green pea crop beyond the optimum maturity for processing, Twin City has the option to divert that portion of Grower's acreage for seed or feed purposes as the quality of the salvage may dictate.

(Italics ours.)

The trial court found that the number of peas ready for harvest at the time of optimum maturity for processing exceeded the expectations of the defendant processor and that the reason for the excess was adverse weather conditions. Accordingly, judgment was entered allowing the plaintiff recovery of $6,615, with interest, for damages computed on the basis of a permissible bypass and for dry peas. The plaintiff's complaint for general damages for failure to harvest and process the pea crop for freezing purposes was dismissed.

The issue raised on appeal is whether there was sufficient evidence for the trial court to find that the "adverse weather" condition was met, so as to excuse the defendant's duty to perform its contractual obligation to harvest the plaintiff's pea crop.

The trial court made the following findings of fact. The adverse weather conditions consisted of an unusual, unexpected and severe fluctuation of ambient temperatures which prevented the routine scheduled maturing of the entire pea crop under contract to the defendant, of which entire crop plaintiff's 63 acres constituted a part. In the period from July 12-20, 1968, the ambient temperatures were lower than normal, generally in the 60-degree range which had the effect of retarding maturation of the peas. From July 21-25, 1968, the ambient temperatures gradually increased, which started the peas "moving" toward maturity. From July 26-August 2, 1968, the ambient temperatures increased rapidly and substantially into the 80-degree range, which snapped all the peas to maximum maturity at the same time, rather than on the scheduled chronological series of ripening and maturity as had been planned and expected.[1] As all the peas unexpectedly matured within an extremely short period of time, the defendant was unable to harvest all the peas of its contract growers and elected to bypass some of the peas.

There is substantial evidence in the record to support this finding. The record contains a recordation of the maximum and minimum temperatures from July 12 through August 2, 1968. Six witnesses appeared at the trial and five indicated that the weather pattern experienced during July and early August of 1968 was unusual and adverse, and one witness failed to testify on the point. The trial court's findings of fact, if supported by substantial evidence, should not be disturbed on appeal. *Thorndike v.*

[1] The maximum and minimum temperatures from July 12 through August 2, 1968 were as follows:

|  |  | Max. | Min. |  |  | Max. | Min. |  |  | Max. | Min. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July | 12 | 66° | 53° | July | 20 | 69° | 54° | July | 28 | 81° | 51° |
|  | 13 | 70° | 50° |  | 21 | 70° | 45° |  | 29 | 78° | 50° |
|  | 14 | 66° | 54° |  | 22 | 72° | 47° |  | 30 | 83° | 49° |
|  | 15 | 69° | 53° |  | 23 | 74° | 45° |  | 31 | 88° | 50° |
|  | 16 | 71° | 45° |  | 24 | 76° | 49° | Aug. | 1 | 88° | 48° |
|  | 17 | 74° | 49° |  | 25 | 77° | 50° |  | 2 | 80° | 50° |
|  | 18 | 76° | 52° |  | 26 | 80° | 50° |  |  |  |  |
|  | 19 | 60° | 53° |  | 27 | 83° | 50° |  |  |  |  |

*Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959); *Zillah Feed Yards, Inc. v. Carlisle,* 72 Wn.2d 240, 432 P.2d 650 (1967); *Lindbrook Constr., Inc. v. Mukilteo School Dist. 6,* 76 Wn.2d 539, 458 P.2d 1 (1969); *Noah v. Montford,* 77 Wn.2d 459, 463 P.2d 129 (1969); *Sylvester v. Imhoff,* 81 Wn.2d 637, 503 P.2d 734 (1972).

Resort must be made to the rules of construction and interpretation in examining the bypass provision of part 5, section 1 of the contract in question.

■ The writing in question is clearly integrated (part 3, section 12 of the contract). A contract provision must be read in pari materia with the whole contract and in light of all the circumstances surrounding the contract. *Henry v. Lind,* 76 Wn.2d 199, 455 P.2d 927 (1969).

Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties. *Jacoby v. Grays Harbor Chair & Mfg. Co.,* 77 Wn.2d 911, 468 P.2d 666 (1970); *Ramsey v. Sedlar,* 75 Wn.2d 901, 454 P.2d 416 (1969); *Schauerman v. Haag,* 68 Wn.2d 868, 416 P.2d 88 (1966); *Dickson v. Hausman,* 68 Wn.2d 368, 413 P.2d 378 (1966).

Both the plaintiff and the defendant were heavily involved in the Washington pea industry, plaintiff as a grower with 8 years of experience and the defendant as a large processor. This fact would indicate that the contract should be construed in light of the usages of the pea industry existing at the time the contract was executed.

As the trial court indicated, it was the well established plan of all the pea processors in the Skagit County area to plant the peas in a staggered manner in order to avoid the entire crop maturing at once. This system was in wide use and known by all the individual growers. In fact, the plaintiff testified as to his knowledge of the custom of staggered planting and the planning and calculation of harvest sched-

uling. Thus, the plaintiff must be held to have had knowledge of the existence of other pea contracts with Twin City Foods, the staggered planting schedule and the reasons therefor.

There is substantial evidence in the record indicating that the weather experienced during the month of July, 1968 was unusual and adverse to the growing and harvesting of peas in that it was the direct cause of the bypassing that occurred in the pea industry that year. Stokely, Libby, McNeill & Libby and National Fruit Can Company, in addition to Twin City Foods, bypassed pea acreage. The only processor or grower appearing at the trial and not experiencing problems in 1968 was Cedargreen Foods. However, at no point did the testimony of the representative of this latter company deal with the disputed findings that the weather conditions were unusual and adverse.

The record supports the trial court's conclusion that the reason that the defendant bypassed the plaintiff's crop is that the weather conditions increased the size of the crops ready for processing beyond any reasonable expectations.

The provisions of the written contract require both parties to make a good faith effort to perform. The findings of fact of the trial court reflect the good faith effort of the defendant. Every effort was made by the defendant to acquire additional vining equipment from eastern Washington, Oregon and other areas. The normal number of viners in the Skagit County area was 68, a number sufficient to harvest the entire contract crop under normal circumstances. Because of the unusual weather conditions, the defendant brought in 28 additional viners to supplement its normal complement, but even the 96 viners proved insufficient to avoid bypassing some acreage. And, as the record discloses, the bypassing was not arbitrary, but was carried out in a systematic manner based, as closely as possible, on the original harvesting schedules.

■■ The definition of adverse weather conditions must be determined in light of reasonable industry custom and usage. Once a contract is established, usage and custom are

admissible into evidence to explain the terms of the contract. *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.,* 49 Wn.2d 363, 301 P.2d 759 (1956). And, parol evidence is admissible to establish a trade usage even though words in their ordinary or legal meaning are unambiguous. *Simons v. Stokely Foods,* 35 Wn.2d 920, 216 P.2d 215 (1950). In view of custom and usage of the pea industry, it can be most reasonably stated that the term "adverse weather conditions" includes unusual temperature fluctuations resulting in an unexpected maturation of an entire pea crop which has been systematically planted with the objective of partial maturation over a period of time to allow for orderly harvesting. This construction of the term in question is especially valid when both parties to the contract were well aware that the purpose of scheduling crops was to avoid maturity of all the contract crops at once and to provide for systematic harvesting.

The contract provides for payment for pea crops which are harvested beyond the optimum maturity for freezing as a processed food by the defendant. The trial court properly awarded plaintiff damages computed on the basis of a permissible bypass of the plaintiff's crop, as provided by the parties' contract.

Judgment of the trial court is affirmed, and judgment of the Court of Appeals is hereby reversed.

FINLEY, HAMILTON, STAFFORD, and UTTER, JJ., concur.

HAMILTON, J. (concurring)—I concur with and have signed the majority opinion because I am satisfied that, under the circumstances of this case, the majority has attached the bilaterally intended meaning to the phrase "adverse weather conditions" as used in part 5, section 1 of the contract in issue.

At the expense of being redundant, I believe it is important to highlight pertinent portions of the two provisions of the contract in question which bear directly upon the issue involved, and to relate them to the course of events which occasioned this lawsuit.

Initially, however, it should be noted the evidence revealed, without substantial dispute, that: In 1967 in the Skagit County area, the defendant had some 12,000 acres under pea growing contracts and in 1968 some 12,200 acres under like contracts; the defendant's normal complement of pea viners maintained in the area was 68, which number was increased from outside sources to 96 during July and August of 1968, nine of which, incidentally, came from defendant's Lewiston, Idaho, operation; since 1948, the defendant bypassed crops in the Skagit County area in only 2 years, 1962 and the year in question, 1968; in 1968 only 600-plus of the 12,200 acres under contract were bypassed, affecting 23 growers of which plaintiff was one; and, other pea processors in the area such as Libby, McNeill & Libby, National Fruit Can Company, and Stokely bypassed crops in 1968, with only Cedargreen, having 3,600 acres under contract, not being required to bypass. It should further be observed the evidence indicated that defendant's processing plants serving the area were not running at full capacity at the time in question, that defendant marketed all the peas processed, and that it was not economically practical for defendant to bypass crops.

I turn now to the two pertinent contractual provisions. As indicated in the majority opinion, part 3, section 12 of the contract provides:

> In Twin City scheduling of time for cutting and delivery, Twin City does not guarantee selection of most desirable time for maximum return of grade or tonnage and is *obligated only to schedule crops in good faith for efficient harvesting and handling of the crop contracted hereby and by other similar contracts with other growers.*

(Italics mine.)

By the terms of this paragraph it is clearly recognized, contemplated, and spelled out within four corners of the contract that the harvest schedule for plaintiff's crop would be carried on in conjunction with and compatible to "other similar contracts with other growers." Plaintiff's contract

by its terms, therefore, was not a single, isolated or unrelated contract, but rather was a part of an integrated and systematic operation for the planting, growing and harvesting of green peas for processing and marketing. The fulfillment of plaintiff's contract, thus, was to some extent at least, dependent upon other growers' crop schedules and the success thereof. Furthermore, there is no evidence to support a conclusion that defendant acted other than in good faith in scheduling the crops for efficient harvesting under the conditions prevailing.

Part 5, section 1, the bypass provision of the contract, provides *inter alia*:

> In the event of *circumstances resulting from adverse weather conditions . . . that may delay harvest of the green pea crop beyond the optimum maturity for processing,* Twin City has the option to divert that portion of Grower's acreage for seed or feed purposes as the quality of the salvage may dictate.

(Italics mine.)

The operative facets of this paragraph are two; first, circumstances due to adverse weather conditions must occur, which, secondly, delay harvest of the pea crop beyond optimum maturity. The focus, therefore, of this paragraph seems to me to be not so much upon the phrase "adverse weather conditions" as upon the *circumstances* arising from such weather conditions which, in turn, *affect the harvest*. Viewed in this sense then, it would appear *reasonable to conclude,* as the trial judge and the author and signers of the majority opinion do, that the phrase "adverse weather conditions" as used in the pea growing contract before the court is not limited in application to such weather manifestations as rain, hail, sleet, snow, flood, or other such inclemencies, but would include any form of weather conditions productive of circumstances *adverse* to the timely harvest of a given pea crop, despite good faith efforts on the part of the harvesters to reach the crop.

The circumstances in this case were weather conditions which, by their nature, first retarded maturation of a sub-

stantial acreage of peas and forced into idleness vining equipment which otherwise would be engaged in harvesting per a systematic maturation schedule, and then suddenly "snapped" the peas into maturity at such a pyramiding rate as to virtually inundate the harvesters. Such weather conditions, it would seem to me, would obviously be adverse when considered in the context of a pea growing and picking operation.

FINLEY, STAFFORD, and UTTER, JJ., concur with HAMILTON, J.

HALE, C.J. (dissenting)—I think that the Court of Appeals decided this case correctly (5 Wn. App. 809, 490 P.2d 1311 (1971)), and I would, therefore, affirm.

Defendant Twin City Foods drew a contract and presented it to plaintiff farmer in mimeographed form for his signature. The escapement clause under which the court denied recovery was prepared by and employed language selected by defendant. It contained the following paragraph upon which the trial court entered judgment:

> In the event of circumstances resulting from *adverse weather conditions,* mechanical failures or other means, *that may delay harvest* of the green pea crop beyond the optimum maturity for processing, Twin City has the option to divert that portion of Grower's acreage for seed or feed purposes as the quality of the salvage may dictate.

(Italics mine.)

In other provisions, the contract gave defendant food processor the choice of scheduling the day or days on which the crop was to be planted, a contractual power which defendant exercised. As construed by defendant processor, the contract also gave it the power—likewise exercised here as the defendant's employees testified—to

> say when the peas would be cut, when they would be vined, when they would be processed? A. [Mr. Ovenell, Twin City field man] Correct. Q. Mr. Stender, or the farmer, doesn't have anything to say about that, is that correct? A. That is correct.

The proof without substantial conflict shows that the

weather which the court found to be adverse according to the terms of the contract produced a bumper crop of fine quality peas. It was not, therefore, adverse weather which caused the loss but, to the contrary, Twin City Foods' failure to put on sufficient crew and machinery to harvest this crop. In short, defendant failed to perform its contract and left a fine crop of high quality peas ungathered.

As drafted by the defendant food processing company and signed by plaintiff farmer, the contract put the defendant in control of the growing and harvesting of the crop, with authority to determine the planting date and to prescribe and schedule the harvesting dates. The plaintiff grower, under the contract, agreed to assume only the risk of mechanical failure or adverse weather conditions—an act of God—which might delay the harvest.

The "adverse weather" upon which defendant relies began with a rather cool mid-July gradually warming to a pleasant-to-warm period at the end of the month and through the beginning of August—hardly a weather condition that could be described as adverse in Western Washington. Such alternation between cool and warm periods during the summer months in the Skagit Valley is not only not rare but even rather common, and this was acknowledged by several witnesses. Although plaintiff Stender characterized this 1968 summer weather pattern as "unusual," and the defendant's witnesses described it as "unusually severe and a bigger swing in temperature than is normal," and as amounting to "unusual conditions," the contract did not speak of "unusual" weather conditions, but rather of "adverse" weather conditions which would "delay harvest." After all, "unusual" and "unusually severe," meaning wider swings between cool nights and hot days, could be regarded as unusually fine weather for growing peas.

It was defendant food processor that blundered; neither nature nor the plaintiff had anything to do with it. Twin City Foods controlled the order of harvesting and selected Mr. Stender's fields for bypass. The defendant company's

faulty decisions occasioned largely by its failure to make adequate plans and preparations and secure sufficient machinery to accomplish harvesting left a substantial part of the grower's peas unharvested—peas which defendant had contracted to harvest and buy. The testimony indicated that, before July 20, the processor was aware that more harvesting machines or viners would be necessary. Mr. Ovenell, Twin City Foods' field man, testified as follows:

Q. Did you have any [viners] in Lewiston or any other place. Did you have any in Lewiston? A. Yes. Q. Do you have any there? A. Yes, right now. Q. No, at the time, available in July? A. Yes, yes, but it takes a day or two to drive them over. Q. Well, if something had been done say on July 20th about starting these viners over here they would have been here in ample time to have been used on July 27th? A. Yes.

Mr. Murphy, field manager for Twin City Foods, testified:

A. Well, I went to Mr. Lynn on the 17th and said, "Harold, we've got to do something. This is bunching up beyond all capacity of our present machines" . . .

Twin City Foods did employ 28 additional viners to accomplish the harvest, bringing its total complement to 96, but that proved to be inadequate. Mr. Murphy testified that, if more machines had been brought in, the harvest could have been accomplished. He testified further that more machines were available in Lewiston, Idaho, but contradicted his employee's estimate of time needed to bring them over. He said 5 days rather than 2 would be needed for the transit.

Twin City Foods, according to the record, knew by July 17 that more harvesting machines would be necessary. Ten days after that, by the 27th of July, Mr. Stender began complaining that his peas were ready for harvest. During that 10-day period, between July 17 and July 27, sufficient additional machines could have been brought in. On July 27, Twin City Foods, having inadequate equipment, decided to bypass plaintiff Stender's fields and give priority to others, but the actual bypass was not accomplished until August 3rd. Twin City Foods' Mr. Murphy testified that as late

as August 2nd, 6 days after the bypass decision was made, the peas were still usable although not of highly desirable quality. The record thus establishes that if, at the time the bypass decision was made on July 27 when Mr. Stender's peas were of highest quality, the additional available machines had been ordered transported from Lewiston, Idaho, even allowing for the longest estimated transit time as computed by Mr. Murphy, defendant's field manager, the machinery would have arrived in time to harvest the Stender crop. But in any event, these problems were responsibilities of Twin City Foods and not those which plaintiff farmer contracted to assume. The full cost of those decisions should fall upon Twin City Foods and not partially upon the farmer.

The weather, as I have noted, produced a good crop. Rather than being adverse to the harvest, it matured a good crop faster than usual. According to the testimony of a field man for Cedargreen Foods, a competitor with growers in the same areas as Twin City Foods, "We had the best year in the history of our company at that time." On this point, plaintiff Stender testified:

> I would say it [the weather] would be very good. . . . In my area we have plenty of moisture, no shortage of moisture. On warm nights it is ideal for peas to mature with a good, good yield.

and, further, that growing conditions

> were ideal . . . The tonnage was very good so I would say the weather was very good for the pea growers in that particular time, basing it on the number of days required to grow this crop.

So the testimony at trial indicated that, while there might never occur "ideal" weather for growing a crop of peas, certainly the weather conditions in this particular year did not adversely affect the yield per acre or the quality of the peas harvested at all, nor did it delay harvest.

There was no evidence of the weather delaying the harvest, except possibly for testimony concerning July 16th

when it rained, but that date was 2 weeks prior to the critical time here. Testimony was given that, because of the rain on July 16, some harvest sets stopped running on that day because of the rain. But except for the rainy day of July 16, there was no testimony that weather conditions of any sort slowed the harvest machines, prevented the machines from working the fields, slowed the harvesters, prevented the harvesters from working, or did anything whatsoever to slow the pace at which the harvesting was being accomplished. The testimony shows that the mechanical processes of harvesting proceeded apace. Except for one rainy day, that of July 16, the men and machines worked hard and well, and that there was absolutely no "delay" of the *harvest* of the pea crop. All that Twin City Foods had to do to fulfill its contract was to provide additional crew and harvesting machinery. It was, therefore, not the weather but the defendant's unwillingness or inability to perform that produced the loss. The problem which Twin City Foods faced, as earlier observed, was not adverse weather but a fine crop ripening a few days earlier than usual.

The majority opinion thus places upon the farmer the risk not only of adverse weather delaying the harvest but also the risk of exceptionally fine weather which operates to hasten the ripening of his crop to a particularly fine level of quality. Such weather, as a matter of law, cannot, under the contract, I think, be deemed, either in the ordinary meaning or in any reasonable understanding of the term, to be "adverse weather." What was unusual about the weather was that it was unusually good. In holding this unusually good weather, which contributed to a fine crop of peas, "adverse weather conditions that may delay harvest," the court not only had to rewrite the contract, but had to construe the language in favor of the draftsman.

Although I do not believe the contract to be ambiguous, if it were it would have to be construed against the party drafting it. *Safeco Ins. Co. of America v. McManemy*, 72 Wn.2d 211, 432 P.2d 537 (1967); *Wise v. Farden*, 53 Wn.2d 162, 332 P.2d 454 (1959). There is nothing in the phrase

"adverse weather delaying the harvest" which might mean weather conditions which hasten the ripening of the crop and produce a high yield per acre of peas of exceptionally fine quality. But if the term should so prove to be ambiguous, then it should be construed against the draftsman, Twin City Foods.

Nothing went wrong with this crop except that the harvesters had taken inadequate steps to cope with the quantities of peas ripening during the period. Twin City Foods made the decision to harvest the peas of some of its contracting farmers and not others. It had arranged for sufficient equipment to harvest some of its farmers' acreages but not to harvest all. The problem it faced was of its own making. With insufficient supply of harvesting machines on hand to work the fields when more were available in Lewiston, the defendant processor tried to put the blame on what it would like to describe as "adverse" weather. But in putting the loss on Mr. Stender rather than on the writer of the contract who had control over the number of viners available to work the harvest, the court, I think, creates an ambiguity out of a patently unambiguous term. The ambiguity thus written into the contract by construction is then construed in favor of the draftsman who wrote it.

The packer had only to direct the planting date and manage the harvest. The packer contracted to tell the grower when to plant the seed and promised to purchase any of the crop which would meet its standards. The grower, however, assumed many risks, but among them was not the risk of an unusually fine crop and unusually good weather. Under the contract he was to do all of the work connected with preparing the soil, planting and caring for the growing crop. The farmer assumed the risks of blight and disease and of cataclysmic destruction of his crop. He took the risk of unseasonal frost or drought which might kill the crop before the harvest, and the risk of hail which might beat the crop to the ground, and the risk of flood which might wash it away. Even when the crop reached maturity as fresh, green and tender peas, under the

contract the farmer allowed the packer to reasonably schedule the harvest although a few days one way or the other might make a substantial difference in quality and thus in the value of the crop. And, in addition to all of these risks, the farmer bound himself to accept the risk of *adverse* weather which might *delay the harvest,* such as the rain which here stopped some harvesting machines on July 16. But nowhere, either expressly or by implication, can I find where the farmer agreed to bear the full risk of abnormally *good* weather conditions which accelerated the ripening and produced a fine crop or that Twin City Foods would not perform its contract to harvest an unusually fine crop of peas.

I would reverse the trial court and affirm the judgment of the Court of Appeals.

ROSELLINI and HUNTER, JJ., concur with HALE, C.J.

Petition for rehearing denied July 17, 1973.