[No. 25930-0-I. Division One. September 16, 1991.]

MOLLY O. KENNEDY, *as Personal Representative,*
*Appellant,* v. SEA-LAND SERVICE, INC.,
*Respondent.*

840

*Michael E. Withey* and *Schroeter, Goldmark & Bender P.S.,* for appellant.

*Roger Davidheiser, Vincent L. Larson,* and *Riddell, Williams, Bullitt & Walkinshaw,* for respondent.

KENNEDY, J. — Appellant Molly O. Kennedy challenges the trial court's summary dismissal of her negligence action against respondent Sea-Land Service, Inc. (Sea-Land). Appellant's decedent, James Kennedy (Kennedy) was employed by Container Stevedoring Company (Container Stevedoring), a subcontractor employed by Sea-Land. Kennedy was killed on the job. We find that there are genuine issues of material fact which, if resolved in appellant's favor, would establish that Sea-Land retained sufficient control over the workplace to give rise to a higher duty of care for the safety of the employees of the independent contractor than would otherwise exist; that there also are genuine issues of material fact as to whether the duty of care was breached; and that there are genuine issues of material fact as to whether any such breach proximately caused the death of Kennedy. Accordingly we reverse the summary judgment of dismissal and remand for trial.

## FACTS

On the morning of October 18, 1984, Kennedy was run over and killed by a toploader, a piece of heavy machinery, while in the course of his employment by Container Stevedoring. On the day of his death Kennedy was working as a "tag-checker".

Sea-Land leases land from the Port of Seattle, Marine Terminal 5, on the Seattle waterfront. On this property Sea-Land maintains a storage yard where large containers are stored prior to being loaded onto vessels, or after being offloaded from vessels berthed adjacent to the terminal.

Sea-Land's usual preferred mode of container storage was to place the containers on wheeled semi-truck chassis for easy movement. However, on some occasions the containers would be placed directly on the pavement of the storage yard and stacked one on top of another. From time to time these "grounded" containers were moved in the course of Sea-Land's business operations. In order to move the containers Sea-Land owned a large toploader manufactured by Clark Equipment Company. The toploader was used to pick up the grounded containers and place them on semi-truck chassis for movement to another location.

Container Stevedoring was the independent contractor employed by Sea-Land to move the containers. The independent contractor provided a driver for Sea-Land's toploader, a foreman who directed the moving operation, several longshoremen who strapped the containers onto the wheeled chassis, and, on the day of his death, Kennedy. Kennedy's job was to tag the containers after they were loaded onto the chassis. These tags provided the routing information for the containers. After the loaded containers were tagged, Kennedy would check them off on a computerized list. Sea-Land maintained a computer system to keep track of the location and destination of its containers. Sea-Land employed storage coordinators who worked the computers and planned the loading and

unloading of vessels. Sea-Land also employed seven stevedore managers whose duty it was to supervise where the grounded containers would be stacked and when and to where they would be moved. Mr. Mooney, Sea-Land's marine manager, had the overall supervisory responsibility to preplan the movement of containers within the yard. He also had the overall responsibility for the safety of the moving operations. He gave the orders to Container Stevedoring, which in turn performed the actual work of loading the grounded containers onto the chassis, strapping them down and tagging them.

On the day of the accident, the toploader was being used to pick up the containers from the grounded stacks. The driver would then back up and load the containers onto wheeled chassis. He would then drive forward again to pick up another container. The toploader was designed in such a manner that the driver had better visibility while backing up than while moving forward.

The toploader was moving in the same general pattern as it had been all that morning. Kennedy was hit while moving from right to left in front of the loader as it moved forward to pick up another container. The attention of the driver was focused on the stack of containers ahead of him. By the time he noticed Kennedy it was too late for him to stop. It is unclear why Kennedy walked in front of the forward moving toploader. There is evidence that Kennedy was not required to cross the path of the moving toploader in order to tag the loaded containers. There is circumstantial evidence that Kennedy may have "pretagged" an awaiting empty chassis. There is also evidence in the record that Sea-Land's workers were waiting to use the toploader for another purpose and there is at least an inference that someone at Sea-Land was in a hurry to obtain access to the toploader. The record also reflects that a contributing cause of the accident was that "everyone was in a hurry" (deposition testimony of Mr. Marshall, the foreman who had been hired by Container

Stevedoring on that particular day). Kennedy was seen running at one point, sometime previous to the accident.

Sea-Land provided not only the toploader but also all of the safety equipment and a safety manual for use by the independent contractor. The independent contractor's management attended Sea-Land's monthly safety meetings. The safety equipment consisted of cones which were used to designate the loading areas, brightly colored safety vests for the workers (Kennedy was not wearing a safety vest) and portable 2-way radios. However, radios were not in use in the toploader, or by the loading crew, or by Kennedy.

The evidence is disputed as to whose responsibility it was to determine whether the use of radios was reasonably necessary and if so, to see that radios were used. Sea-Land's witnesses claimed that duty rested with the independent contractor. Appellant's witnesses claimed that duty rested with Sea-Land.

The fatality occurred in an area bisected by a painted pedestrian walkway. The walkway led from an employee parking lot to the main operations building. Because of the location of the grounded containers, the toploader was being moved backward and forward across the pedestrian walkway. There was no stop sign at the walkway; nor was the toploader required to stop before crossing the walkway. Kennedy was not struck in the pedestrian walkway but rather some 14 feet from it. It is undisputed that the walkway was for the use of persons going from the parking lot to the operations building, rather than having any purpose related to the loading operation. However, there is at least an inference that a requirement that the toploader stop before crossing the walkway, even if intended for the safety of others than Kennedy, may have enabled the driver to see Kennedy before it was too late.

Sea-Land performed certain modifications on the toploader prior to the accident, principally the installation of an audible backup signal. The evidence is disputed as to whether the toploader was equipped with a forward-

moving signal. Sea-Land claims there was a forward-moving alarm or signal. Appellant's expert witness claimed there was no such signal. Appellant claims that Sea-Land negligently failed to equip the toploader with a 2-way radio and with an auditory and visual signal for the forward movement of the vehicle. A mirror intended to enhance the driver's forward visibility was placed in such a manner that the driver was required to turn his head 90 degrees in order to utilize the mirror.[1]

Container Stevedoring has only one employer, Sea-Land. Sea-Land and Container Stevedoring are each subsidiaries of a parent corporation. Container Stevedoring has only three full-time employees, one of whom is a secretary. Container Stevedoring hires laborers as needed from local union halls.

In 1970 Sea-Land and Container Stevedoring entered into a written contract which provides in relevant part:

1. *Services.* Sea-Land hereby contracts with contractor to perform certain functions as described herein and contractor agrees to perform such services, which services include, but are not limited to the following; (a) the employment and supervision of stevedore labor, *subject always to direction and supervision of Sea-Land, necessary to the performance of contractor's obligations hereunder . . .*

. . . .

9. *Status of Party.* In performing any of the services called for under this agreement, contractor shall operate as an independent contractor, maintaining its own organization as a distinct and separate legal entity from Sea-Land and *performance hereunder shall be subject entirely to the internal direction and control of contractor* and none of its employees shall be, or be deemed to be, employees of Sea-Land for any purpose whatsoever . . . *Contractor agrees, however, to abide by the policies, rules, and procedures which Sea-Land may from time to time establish pertaining to the operation and maintenance of Sea-Land terminals.*

(Italics ours.)

---

[1] Appellant has also brought this action against Clark Equipment Company, the manufacturer of the toploader, for products liability, breach of warranty and negligence. Clark Equipment Company was not a subject of the summary judgment proceeding below. The trial date for the claims against the manufacturer has been stayed pending the disposition of this appeal.

## ISSUES

Appellant argues that Sea-Land contractually reserved sufficient control over the independent contractor to give rise to a common law duty of care as to the safety of the employees of the independent contractor and that Sea-Land breached its duty of care by (1) selecting an unsafe jobsite for the grounding operations; (2) failing to adequately preplan the operation and the jobsite; (3) providing an unsafe Sea-Land owned toploader for use by the independent contractor; and (4) failing to install or require use of adequate safety warning devices and radio communication equipment.

Respondent argues that the contract provides that the performance of the stevedoring work be left *entirely* to the internal direction and control of the independent contractor; that Sea-Land's only duty as to Kennedy was to exercise ordinary care to have its equipment and premises in such condition that an expert and experienced stevedore would be able to function safely by the exercise of reasonable care; to warn of hidden hazards that would not be obvious to a competent stevedore; and to intervene to remedy a dangerous condition but only if the owner actually knows of the dangerous condition. Sea-Land also argues that it had no duty to plan and supervise safety procedures in the detail of the grounding operation, because it lacked sufficient retained control over the grounding operation. Further, Sea-Land argues that since it was not cited for violation of any WISHA violation, it had no duty to Kennedy which was violated and since Sea-Land is not a "general contractor" but rather a mere "employer" of Container Stevedoring, it did not have primary responsibility as to the employees of the subcontractor for compliance with safety regulations. Sea-Land also argues that it had no duty to install any additional safety devices on the toploader.

Finally, appellant argues that "land-based" law governs the duty of care issue and respondent argues that maritime law governs that issue.

We will first address the question of which law governs the issue of duty of care, and then we will proceed to the merits of appellant's request that we reverse the summary dismissal of her claim against Sea-Land.

## DISCUSSION

1. *Does maritime or land-based law govern Sea-Land's duty of care as to the safety of the employees of Container Stevedoring?*

Sea-Land, without citations to any relevant authority, argues that maritime law governs the duty of care issues in this case.[2] Appellant, without citation to any relevant authority, argues that land-based law governs. Although neither party has provided any relevant authority, both agree that the issue of which law governs is "central to the case." We agree that the issue is central. Appellant is correct. We hold that land-based law governs in this instance.

The case of *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 30 L. Ed. 2d 383, 92 S. Ct. 418 (1971) bears a striking similarity to the instant matter. There, Law, a longshoreman, was injured on a pier while driving a forklift truck which was moving cargo that would ultimately be loaded aboard ship. The ship, which was owned by Victory Carriers, Inc., was tied up to the pier. Law was the employee of a subcontracting stevedore. The stevedore owned the forklift. The forklift was apparently defective, in that the overhead protection rack on the forklift came loose and fell on Law. He subsequently brought an action against Victory in federal district court in which he tried to invoke maritime law by claiming that the unseaworthiness of the vessel and the negligence of Victory had caused his injury. Law reasoned that because he was engaged in loading the ship and the forklift was part of the gear being used for that process, maritime law ought to apply.

---

[2]A possible basis for Sea-Land's position is that Kennedy's widow received compensation for his death pursuant to the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 904 *et seq*.

The federal District Court disagreed and granted summary dismissal to Victory. The Fifth Circuit Court of Appeals disagreed with the District Court and reinstated the claim. The United States Supreme Court granted certiorari, reversed the Court of Appeals and declined to extend the historic boundaries of maritime law.

> The historic view of this Court has been that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident and that maritime law governs only those torts occurring on the navigable waters of the United States. . . .
> . . . [A]ccidents on land were not within the maritime jurisdiction as historically construed by this Court. Piers and docks were consistently deemed extensions of land; injuries inflicted to or on them were held not compensable under the maritime law. The gangplank has served as a rough dividing line between the state and maritime regimes.

(Footnotes and citations omitted.) *Victory Carriers*, at 205-07.

Justice White, writing for the majority, also noted:

> That longshoremen injured on the pier in the course of loading or unloading a vessel are legally distinguished from longshoremen performing similar services on the ship is neither a recent development nor particularly paradoxical. The maritime law is honeycombed with differing treatment for seamen and longshoremen, on and off the ship . . . .. In part, this differential treatment stems from the geographical and historical accident that personal injuries on land are covered, for the most part, by state substantive law while such injuries on navigable water are generally governed by federal maritime law.

(Footnote omitted.) *Victory Carriers*, at 212-13.

Justice White concluded by noting that if Congress wished to extend the traditional boundaries of maritime law by amending the Longshore and Harbor Workers' Compensation Act (LHWCA), such was the province of Congress and not of the courts.

Since 1971 when the opinion in *Victory Carriers* was issued, Congress has amended the LHWCA, and a handful of claimants have argued that these amendments did indeed extend the traditional boundaries of maritime law.

In *Griffis v. Gulf Coast Pre-Stress Co.*, 850 F.2d 1090 (5th Cir. 1988), one subcontractor's employee brought a negligence action in federal district court against another subcontractor and the general contractor, seeking to recover for injuries sustained while working on construction of barges on a manmade canal in Louisiana. The employee sought to recover under maritime law in federal district court because state law gave immunity to both defendants.

The Fifth Circuit Court of Appeals ruled that the (1972 and) 1984 amendments to § 905 of LHWCA had not created a federal maritime negligence action.

> The claim in this case rests on negligence principles, a purely local matter in the absence of federal authority, and therefore the appropriate forum is a court in the State of Louisiana.

*Griffis*, at 1092.

In *McBride v. Metric Constructors, Inc.*, 387 S.E.2d 780 (Va. 1990), a painter was loaned to a subcontractor to paint a tunnel being constructed by a general contractor. The general contractor had contracted to construct the tunnel in a shipyard adjacent to the James River. The painter was injured on the job by a falling pipe. He was compensated under LHWCA and then brought a common law negligence action against the general contractor and the shipyard owner. Under Virginia law the claim was barred as to both defendants. Under § 905 of LHWCA the claim was not barred. The painter argued that the (1972 and) 1984 amendments to LHWCA had created a maritime negligence action in his favor. But as pointed out by the Virginia court:

> [The painter] overlooks the fact that state tort law governs negligence actions arising out of industrial accidents which occur in an area within the concurrent application of the federal act and a state compensation statute. . . .
>
> . . . .
> To find that these amendments [to LHWCA] *create* a federal cause of action . . . we must conclude that their language clearly expresses a Congressional intent to expand federal maritime jurisdiction into an area traditionally controlled by state law. . . .

Our review of these amendments discloses neither an express nor an implied intent to expand federal admiralty jurisdiction . . ..

(Citations omitted.) *McBride*, at 781, 782-83.

 This court concludes that although there is at least one case which appears to have reached a contrary result, *see Garvin v. Alumax of S.C., Inc.*, 787 F.2d 910 (4th Cir.), *cert. denied*, 479 U.S. 914, 93 L. Ed. 2d 288, 107 S. Ct. 314 (1986), the prevailing and sounder view is that although Kennedy's widow was entitled to and did receive compensation pursuant to LHWCA (as did the painter in *McBride*), Congress has not extended the principles of federal maritime law to shoreside tort claims such as that raised by appellant.

Accordingly, as we analyze the duty of care owed by Sea-Land to Kennedy for the purposes of review of the summary dismissal of appellant's claim, it is to land-based law that we must turn.[3]

2. *What was the duty of care owed by Sea-Land as the employer of Container Stevedoring, an independent contractor, to the employees of the contractor?*

Under the common law of tort, one who engages an independent contractor is not liable for injuries to employees of the independent contractor. W. Prosser, *Torts*

---

[3]Sea-Land has relied heavily upon the rulings in *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 68 L. Ed. 2d 1, 101 S. Ct. 1614 (1981) and *Cowsert v. Crowley Maritime Corp.*, 101 Wn.2d 402, 680 P.2d 46 (1984). Both of those cases arose out of injuries received by longshoremen-employees of independent contractor stevedoring companies. Both claimants were injured while working aboard moored vessels, a location historically covered by maritime law. The cases are thus inapposite, insofar as they rely on maritime principles as to duty of care. The 1972 amendments to LHWCA themselves were intended "to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore . . ." *Cowsert*, at 405 (quoting S. Rep. No. 1125, 92nd Cong. 10 (1972)). Thus certain land-based principles were extended beyond the gangplank and onto the vessel, in derogation of the previous maritime principles of strict liability for injuries caused by the "negligence of [the unseaworthy] vessel." 33 U.S.C. § 905(b). This is not to say, however, that insofar as the duty of care aboard ship is governed by federal maritime law, those same principles can be carried back ashore to limit the duty owed to an employee of a subcontractor under land-based law.

468 (4th ed. 1971); Restatement (Second) of Torts § 409 (1965); *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 582 P.2d 500 (1978). However, there are various exceptions to this general rule. The exceptions are based on common law, sometimes on statutes, and on contractual assumption of duty. *Kelley*, at 330. One such exception occurs when an employer of an independent contractor controls an area of the independent contractor's work. Where the employer of the independent contractor retains control over some part of the work, the employer has a duty, within the scope of that control, to provide a safe place of work. *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 549 P.2d 483 (1976); *Greenleaf v. Puget Sound Bridge & Dredging Co.*, 58 Wn.2d 647, 364 P.2d 796 (1961); Restatement (Second) of Torts § 414 (1965); *Kelley*, at 330. The test of control is not actual interference with the work of the independent contractor, but the right to exercise such control. *Fardig v. Reynolds*, 55 Wn.2d 540, 348 P.2d 661 (1960); *Kelley*, at 330-31.

In *Kelley* our Supreme Court adopted the approach of the Michigan Supreme Court in placing the ultimate responsibility for job safety in all common work areas at construction sites upon the general contractor. In *Funk v. General Motors Corp.*, 392 Mich. 91, 220 N.W.2d 641 (1974), the Michigan Supreme Court noted that there is a real threat of danger on a construction project and reasoned that the best way to ensure that safety precautions are taken is to make the general contractor responsible for them. In *Kelley* the general contractor had contractually assumed responsibility for initiating, maintaining and supervising safety precautions and programs in connection with the work. Our Supreme Court ruled that this contractual responsibility was nondelegable, even though the subcontractor whose employee was injured on the job had promised to be responsible for any statutory safety

violations. In *Kelley* the general contractor's duty was defined as the duty

> to provide a safe place of work for employees of subcontractors on the jobsite. This duty extends to providing reasonable safety equipment where necessary.

*Kelley*, at 333. In the words of the Michigan Supreme Court:

> We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen.

*Kelley*, at 332 (quoting *Funk*, at 104).

The bases for the general contractor's liability in *Kelley*, insofar as are clearly relevant to the instant appeal, were: (1) that the authority a general contractor has to require safety precautions falls into the rubric of control as an exception to the common law rule of nonliability; and (2) the general contractor in *Kelley* had a nondelegable, contractual duty to the owners which imposed affirmative duties regarding safety measures.[4]

In *Kelley*, the general contractor's failure to comply with its duty (by requiring the use of safety nets for workers more than 25 feet off the ground in accord with an OSHA regulation) was the basis for liability for the injury of a worker who fell from a high beam during the construction of a tall building. The failure to comply with OSHA was negligence per se.[5] The OSHA regulation was also rele-

---

[4]The two other bases for liability were RCW 49.16.030 (since repealed); and the common law exception of inherently dangerous nature of the work, Restatement (Second) of Torts § 427 (1965). As to this latter basis, however, *see Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 635 P.2d 426 (1981) wherein the Supreme Court reaffirmed the case of *Epperly v. Seattle*, 65 Wn.2d 777, 399 P.2d 591 (1965), noting however a "possible exception" as in *Kelley*, where the employer of the independent contractor knows of inherent hazards and is in a position to protect against them. *Tauscher*, at 279.

[5]*See* RCW 5.40.050 (Laws of 1986, ch. 305, § 901) enacted after the decision in *Kelley*; *see also Doss v. ITT Rayonier, Inc.*, 60 Wn. App. 125, 129-30, 803 P.2d

vant evidence as to the appropriate standard of reasonable care.

In the case of *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 788 P.2d 545 (1990), our Supreme Court reaffirmed the principles of *Kelley* in a case where the employee of a subcontractor fell three stories off a slippery roof. There was no scaffolding or other safety equipment to break the fall. The owner/developer who was acting as its own general contractor knew the employees of the "sub" were working without safety devices. The *Stute* decision that the general contractor was liable had two bases: (1) that the general contractor's obligations under relevant WISHA regulations extended to the employees of the subcontractor as well as to the "general's" own employees; and (2) that the common law exception to nonliability of employers of independent contractors to the employees of the "sub" applies to general contractors for the reasons stated in *Kelley*: as a matter of policy, a general contractor, who by the very nature of his role retains control over the work, is in the best position to implement necessary precautions and provide necessary safety equipment.

Sea-Land argues that *Kelley* and *Stute* do not apply to this case, because Sea-Land is not a general contractor, but rather a mere employer of the independent contractor.[6] Further, Sea-Land points out that in both *Stute* and *Kelley* the general contractor had violated OSHA or WISHA regulations, and that Sea-Land violated no such regulations in this case.

---

4, *review denied*, 116 Wn.2d 1034 (1991). RCW 5.40.050 abolished the common law doctrine of negligence per se based on violation of a statute or regulation; we agree with the *Rayonier* court when it said that this statute eliminates no duty created by statute or regulation; in fact it expressly recognizes such duty. It merely lessens its legal impact.

[6]Sea-Land also claims that *Stute* and *Kelley* are inapplicable because plaintiff failed to assign error to the trial court's conclusion that *Cowsert v. Crowley Maritime Corp.*, 101 Wn.2d 402, 680 P.2d 46 (1984) governed the existence of any duty from Sea-Land to Kennedy. However, respondent misreads appellant's duty in assigning error. Appellant assigned error to the trial court's grant of summary judgment, specifically stating that the order was error "where Sea-Land had contractual authority and operational control over the safety of the

Sea-Land's first argument has been recently decided adversely to Sea-Land's position by Division Two of this court in *Doss v. ITT Rayonier, Inc.*, 60 Wn. App. 125, 803 P.2d 4, *review denied*, 116 Wn.2d 1034 (1991).[7] In that case one Swagerty worked for an independent contractor hired for periodic cleaning of Rayonier's boiler at its Port Angeles mill. Swagerty was killed while working inside the boiler. A big chunk of slag fell from above and struck Swagerty. A WISHA regulation required the use of a safety net. No such net was in use.

The *Rayonier* court found no appreciable difference in the context of that case between an owner-independent contractor relationship and a general contractor-subcontractor relationship, citing *Kelley*, at 330. *Rayonier*, at 127 n.2.[8]

■ We agree with Division Two on this question, limited however to employers who exercise the requisite degree of control over the work of the independent contractor. As was pointed out in *Aceves v. Regal Pale Brewing Co.*, 24 Cal. 3d 502, 509-10, 595 P.2d 619, 622, 156 Cal. Rptr. 41, 44 (1979) (quoting Restatement (Second) of Torts § 413, comment *f* (1965):

> "[A]n inexperienced widow employing a contractor to build a house is not to be expected to have the same information, or to make the same inquiries, as to whether the work to be done is likely to create a peculiar risk of physical harm to others, or to require special precautions, as a real estate development company employing a contractor to build the same house."

---

premises." In entering the order granting summary judgment, the trial court made no specific findings or conclusions nor did it state that the *Cowsert* case controlled the outcome of the decision. Therefore, appellant's assignment of error is more than sufficient to alert the court to appellant's claim that the trial court erred in granting summary judgment by not recognizing the presence of a duty.

[7]*See also Weinert v. Bronco Nat'l Co.*, 58 Wn. App. 692, 795 P.2d 1167 (1990).

[8]Further, RCW 49.17 (WISHA) defines "employer" to include all business entities who employ one or more employees or who contract with one or more persons for personal labor. RCW 49.17.020(3).

Sea-Land is not in any way comparable to "an inexperienced widow employing a contractor to build a house". The common law retained-control exception to the general rule of nonliability refers to "employers" and is not limited to "general contractors". Restatement (Second) of Torts § 414 (1965); *Kelley*, at 330. The relevant issue is the degree of retained control.

We hold that Sea-Land, as the employer of Container Stevedoring, *if it retained the requisite degree of control over the work*, had the same duty of care as would a general contractor under *Kelley*.

■■ As to Sea-Land's argument that *Kelley* and *Stute* do not apply to an employer who has not violated OSHA or WISHA, we disagree. Violation of a statute or safety regulation may be considered by the trier of fact as evidence of negligence, RCW 5.40.050, but that no such statute or regulation was violated is not dispositive of the issue of negligence. A duty can arise *either* from common law principles *or* from a statute or regulation. *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 932, 653 P.2d 280 (1982); *Rayonier*, at 129. A duty can also arise contractually. *Kelley*, at 330.

3. *Are there genuine issues of material fact requiring reversal of the summary dismissal of appellant's claim?*

Having ruled that it is possible for Sea-Land as an employer of an independent contractor to have a duty to the independent contractor's employees, we turn now to the question of whether there is evidence in this case that Sea-Land retained sufficient control over the work of Container Stevedoring to come within the common law exception to nonliability as to Container Stevedoring's employee Kennedy.

■■ This being a summary judgment proceeding, this court is to engage in the same inquiry as the trial court. *Parkin v. Colocousis*, 53 Wn. App. 649, 652-53, 769 P.2d 326 (1989); CR 56(c). We must consider the facts in a light most favorable to the nonmoving party. An order granting summary judgment should be affirmed only if from all the

evidence reasonable persons could reach but one conclusion, *i.e.*, that the moving party is entitled to judgment as a matter of law. *Detweiler v. J.C. Penney Cas. Ins. Co.*, 110 Wn.2d 99, 108, 751 P.2d 282 (1988); *Parkin,* at 653; *Reese v. Sears, Roebuck & Co.*, 107 Wn.2d 563, 731 P.2d 497 (1987). A defendant as moving party may prevail by showing that there is an absence of evidence to support the plaintiff's case, but such moving party bears the burden of such showing. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989). Only after the moving party meets its burden of either producing factual evidence showing that it is entitled to judgment as a matter of law, *Graves v. P.J. Taggares Co.*, 94 Wn.2d 298, 616 P.2d 1223 (1980), or that there is an absence of evidence to prove a key portion of plaintiff's case, *Young*, does the burden shift to the nonmoving party. *Hash v. Children's Orthopedic Hosp. & Med. Ctr.*, 110 Wn.2d 912, 915, 757 P.2d 507 (1988). A party cannot use legal conclusions in affidavits to create material issues of fact in order to support or defeat a motion for summary judgment. *Hiskey v. Seattle*, 44 Wn. App. 110, 720 P.2d 867, *review denied*, 107 Wn.2d 1001 (1986).

■ ■ Under Washington law, negligence has four elements: duty, breach of duty, causation and injury. *See, e.g., In re Estates of Hibbard*, 60 Wn. App. 252, 259, 803 P.2d 1312, *review granted*, 116 Wn.2d 1023 (1991). In order to defeat this motion for summary judgment (assuming the moving party has first met its burden), appellant must show that there is a genuine issue of material fact with respect to each of these elements. Although injury is acknowledged in the present case, Sea-Land has argued that appellant has failed to produce competent evidence of material facts to support the existence of a duty or a breach of duty which was a proximate cause of Kennedy's death.

■ ■ A material fact is one upon which the outcome of the litigation depends, in whole or in part. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980).

Affidavits submitted in support of, or in response to, a motion for summary judgment must set forth such facts as would be admissible in evidence. CR 56(e). An affidavit does not raise a genuine issue for trial unless it sets forth facts evidentiary in nature, *i.e.*, information as to "what took place, an act, an incident, a reality as distinguished from supposition or opinion." *Grimwood v. University of Puget Sound, Inc.*, 110 Wn.2d 355, 359, 753 P.2d 517 (1988). Ultimate facts, conclusions of fact, or conclusory statements of fact are insufficient to raise a question of fact. *Grimwood*, at 359-60; *Curran v. Marysville*, 53 Wn. App. 358, 766 P.2d 1141, *review denied*, 112 Wn.2d 1020 (1989).

## A
### Evidence as to Duty

We find ample evidence in this case, albeit much of it disputed, from which a trier of fact could conclude that Sea-Land retained sufficient control over the work of Container Stevedoring to bring Sea-Land under the common law exception to nonliability. The contract between Sea-Land and Container Stevedoring is on its face ambiguous and will have to be interpreted in order to determine the parties' intent. On the one hand, the contract states that Container Stevedoring's performance "shall be subject entirely to the internal direction and control of [Container Stevedoring]." On the other hand, the contract states that Container Stevedoring's supervision of stevedore labor shall be "subject always to direction and supervision of Sea-Land, necessary to the performance of [Container Stevedoring's] obligations hereunder." Further, Container Stevedoring agreed to "abide by the policies, rules and procedures which Sea-Land may from time to time establish . . .".

Sea-Land argues that the contract conclusively states that Container Stevedoring was solely responsible for the safety of its employees. Appellant argues that the contract conclusively states that Sea-Land at all times retained

the right to direct and supervise Container Stevedoring's performance.

We are inclined to agree with appellant as to the interpretation of the contract, based in part on the language of the contract and in part on the parties' conduct during the term of the contract (testimony indicates that Mooney, Sea-Land's marine manager, had overall supervisory responsibility to preplan the movement of containers and for the safety of the moving operations. Sea-Land conducted safety meetings which were attended by Container Stevedoring managers).[9]

However, we stop short of any ruling that Sea-Land retained sufficient contractual control to bring it within the common law exception to nonliability as a matter of law. Such a determination is initially for the court below, and the record on appeal does not demonstrate that this question was posed directly to the court. Nor are we certain that all of the relevant evidence as to the interpretation of the contract is contained in the record on appeal. Accordingly, we rule that the contract, being ambiguous on its face, will require interpretation in order to determine the parties' intent on the subject of retained control in the context of Sea-Land's duty of care to the employees of Container Stevedoring.

Regardless of the issue of contractual retention of such control, the evidence also clearly reflects an issue as to the degree of control *actually exercised* by Sea-Land. Ordinarily it is the right to exercise control rather than actual interference which is the test, *Fardig v. Reynolds*, 55 Wn.2d 540, 544, 348 P.2d 661 (1960). However, the degree of control *actually exercised* may not in all cases

---

[9]Determination of the intent of the contracting parties is to be determined by viewing the contract as a whole, the subject matter of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties. *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973); *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990).

depend upon the written terms of a contract. This may be such a case. Such issue is for the trier of fact.

## B
## Evidence as to Breach of Duty and Proximate Cause

The record reflects that both parties fell, from time to time, into the trap of relying upon conclusory statements of fact, supposition and opinion, in support of their respective positions in these summary judgment proceedings. It would unduly prolong this opinion to dissect the rather voluminous record in order to separate the "wheat" from the "chaff" in terms of competent and incompetent evidence, when we have already determined that there are genuine issues of material fact on the issue of retained control. We will not take that unnecessary step; but we do find from the record that appellant has also managed to demonstrate genuine issues of material fact by competent evidence as to each of her theories of breach of duty, and as to the issue of proximate cause. The record does not support Sea-Land's conclusory allegation that all that has been demonstrated is that the sole cause of the accident was Kennedy's own negligence. There is disputed evidence upon which a rational trier of fact could base findings that (1) the Sea-Land owned toploader was inadequately equipped with safety devices which, had they been present, more likely than not would have alerted Kennedy or the driver or both to Kennedy's imminent danger (forward sounding alarm; 2-way radio); (2) radio communication between Kennedy and the driver of the toploader more likely than not would have enabled Kennedy to alert the driver to his peril; (3) radio communication between the driver of the toploader and others in the crew more likely than not would have enabled a crew member to alert Kennedy and the driver to the danger; (4) a requirement that the toploader stop at the painted walkway (for the safety of anyone who might be utilizing the walkway, this being an area of at least some pedes-

trian traffic) more likely than not would have enabled the driver to focus on Kennedy, who although not in the walkway itself was moving from right to left some 14 feet ahead of the walkway and therefore was there to be seen; (5) a better mirror design (this one required the driver to turn his head 90 degrees in order to have full forward visibility) more likely than not would have enabled the driver to see Kennedy in time;[10] and (6) the risk of injury was reasonably foreseeable and more likely than not could have been prevented in this case by adequate safety alterations to the toploader and/or by adequate preplanning of the job.

There is also ample evidence upon which a trier of fact could find (1) that contributory negligence by Kennedy (failure to wear a safety vest when the evidence indicates that the manager of Container Stevedoring ordered their use that morning; failure to remain alert to the movement of the toploader, which had been moving in the same pattern all that morning; failure to adhere to the specific routine for the tag-checker's operation (the routine required Kennedy to move out of the way and over to an automobile which had been provided for his use between each tagging operation)) was the sole cause of the accident; or (2) that while Sea-Land had a duty to provide a safe place of work for the employees of Container Stevedoring, it did not breach that duty as to Kennedy, who appears to have been an experienced individual working in an inherently hazardous environment.[11]

---

[10] In this regard we refer the parties to Restatement (Second) of Torts § 392 (1965) (when a chattel has been supplied for use by another for the owner's business purpose there is a duty to make a reasonable inspection for hidden defects).

[11] See Epperly v. Seattle, 65 Wn.2d 777, 399 P.2d 591 (1965); Tauscher v. Puget Sound Power & Light Co., 96 Wn.2d 274, 635 P.2d 426 (1981). See also Kelley and the comment in footnote 4 of this opinion. The parties have not raised the rulings in Epperly and Tauscher in this appeal. Whether those cases control Sea-Land's duty on the issue of liability, or whether the "Kelley exception" noted in Tauscher, at 279 controls may become an issue at the trial of this case. (Washington has not adopted the view that a landowner's nondelegable duty, to

In short, the record clearly indicates that neither party is entitled at this time to judgment as a matter of law. Summary judgment of dismissal of appellant's claims was therefore error.

CONCLUSION

The summary judgment of dismissal is reversed and the case is remanded for a trial on the merits.

COLEMAN and AGID, JJ., concur.

see that an independent contractor who is hired to do ultrahazardous work performs with the requisite care to avoid injury to others, extends to the employees of the independent contractor. That nondelegable duty is for the protection of third parties, with the "possible exception", as in *Kelley,* where the owner or general contractor knows of inherent hazards and is in a position to protect against them. *Tauscher,* at 279. We merely alert the parties to this potential issue, as the record and briefs do not provide us with sufficient information from which to decide the matter).