19 P.3d 461 (2001)
105 Wash.App. 123
Jeff KAMLA and Lois Kamla, husband and wife, Appellants,
v.
THE SPACE NEEDLE CORPORATION, a Washington corporation, Respondent.
No. 45728-4-I.
Court of Appeals of Washington, Division 1.
March 5, 2001.
*463 David A. Bufalini, Tacoma, Stephen L. Bulzomi, Messina Law Firm, Tacoma, for Appellants.
Robert L. Christie, Johnson & Martens P.S., Seattle, for Respondent.
*462 BAKER, J.
Jeff Kamla appeals from the summary judgment dismissal of his personal injury action against The Space Needle Corporation (Space Needle). Kamla, an employee of a fireworks company, was injured by the movement of the Space Needle elevator while he was installing fireworks on the Space Needle. Kamla contends the trial court erred in concluding that Space Needle did not owe him a duty of care.
We affirm in part, and reverse in part. The Space Needle owed Kamla a common law duty of care based on his status as an invitee. Space Needle did not owe Kamla either a statutory duty of care under Stute v. P.B.M.C., Inc.,[1] or a common law duty based on retained control over the work of Kamla's employer.

I
Kamla was an employee of Pyro-Spectaculars ("Pyro"). For several years, Pyro was hired by Space Needle to provide fireworks on New Years Eve. In 1997, fireworks were installed on the 200-foot level of the Space Needle for the first time. The 200-foot level is a hexagonal platform through which the Space Needle's three elevators pass. There are no guardrails or other barriers around the elevator openings. The use of the 200-foot level presented new safety issues. In addition to the danger of falling, Pyro employees were exposed to the danger of the elevators moving through their work area.
The danger of the moving elevators was obvious to everyone, but the elevators were not shut down while Pyro employees were working on the 200-foot level. Space Needle retained control over the elevators, and Space Needle employees operated the elevators. During the firework set up, Space Needle ran the elevators for normal passenger use at normal operating speeds. No special precautions were taken as the elevators passed through the 200-foot level.
The contract between Space Needle and Pyro required Space Needle to provide access to the site and "technical assistance and support." Space Needle and Pyro employees had several meetings to discuss safety issues, including the danger posed by the moving elevators. Space Needle required a mandatory safety meeting with Pyro employees prior to performance of Pyro's work, but the Space Needle was not involved in actually setting up the fireworks.
On December 30, 1997, Kamla began work installing fireworks on the 200-foot level. A Pyro employee gave Kamla a long safety line. Kamla attached his safety line to the core of the Space Needle near an elevator shaft. As Kamla moved around the elevator opening, his safety line was dragged over the opening. The elevator descended, snagged the safety line, and pulled Kamla down through the opening. At the time of the accident, the elevator was in regular passenger service under the control of Space Needle.
The accident was investigated by John Petruzzelli, a safety compliance officer with the Department of Labor and Industries. Petruzzelli issued several citations to Pyro, at least one of which related to the failure to "lockout/tagout" the elevator to prevent it from moving while Pyro employees were working.
*464 Kamla sued Space Needle for personal injuries. Space Needle moved for summary judgment, arguing that it did not owe or breach a duty of care to Kamla.
A Disputed Evidence of Space Needle's Control Over the Elevator and the Work Site
Space Needle submitted a declaration by Ian Gilfillan, the vice-president and general manager of Pyro. Gilfillan declared that:
Pyro-Spectacular's employees contemplated whether to shut off the elevators during our set up of the 200-foot level fireworks display. Rather than have the elevators shut off, the crew assigned to work on the 200-foot level had a safety meeting and identified how we would proceed with our work in order to avoid the elevator openings. I never made the request that the Space Needle shut off the elevators. To my knowledge, no employee of Pyro-Spectaculars ever made the request that the Space Needle shut off the elevators. I have no doubt that the Space Needle would have turned off the elevators had we requested.
Space Needle also submitted a declaration by Thomas Spencer (Space Needle's chief engineer) that the Space Needle was never asked to shut down the elevators, and that it would have done so if requested.
In response, Kamla submitted a declaration of Petruzzelli, in which Petruzzelli related statements allegedly made by Gilfillan, Spencer, and Russ Goodman (president of Space Needle). Space Needle moved to strike the declaration on grounds that it contained inadmissible hearsay that is not proper evidence on summary judgment under CR 56(e).
According to Petruzzelli, at a meeting after the accident Petruzzelli asked Spencer, in the presence of Gilfillan and Goodman, whether or not the Space Needle had retained direction and control over the set up of the fireworks show, and over the facility of the Space Needle. Spencer replied that Space Needle had "absolutely" retained control because the Space Needle was "our building." The trial court denied Space Needle's motion with respect to these statements. However, in ruling on the issue of duty, the court held that Spencer's statements were ultimate conclusions of fact that were insufficient to prevent summary judgment under Grimwood v. University of Puget Sound, Inc.[2]
Petruzzelli attended a hearing on the Washington Industrial Safety and Health Act (WISHA) violations. According to Petruzzelli, Gilfillan stated at the hearing that (i) Pyro had a history of problems in obtaining cooperation from Space Needle to modify the operation of the elevators during the set up process for prior fireworks shows, (ii) Space Needle had consistently demonstrated a reluctance to shut down or otherwise alter the operation of the elevators, and (iii) Space Needle did not want to alter the operation of the elevators because it would impact Space Needle's business. The trial court granted the motion with respect to Gilfillan's alleged statements, holding that these statements did not constitute substantive evidence and were admissible for impeachment purposes only.
Kamla submitted evidence that after Kamla's fall Space Needle reviewed safety issues on the 200-foot level. New attachment points were recommended, and the elevators were stopped in a position to block the openings while workers were on the 200-foot level. It is undisputed that all the safety measures taken after the accident could have been taken by Space Needle before the accident. Space Needle moved to strike this evidence under ER 407 (subsequent remedial measures). Kamla argued that this evidence was admissible to show Space Needle's control over the accident site. The trial court excluded this evidence.
B. Trial Court's Rulings on Duty of Care
The trial court granted summary judgment for Space Needle. First, the court determined that there was insufficient evidence to find that Space Needle had retained control over the workplace, and held that Space Needle did not owe Kamla a duty of care under the common law. Second, the court held that Space Needle was not Kamla's employer and *465 that it did not owe Kamla a statutory duty to enforce WISHA regulations. Finally, the court held that Space Needle was not liable for failing to warn Kamla of the moving elevators because the hazard presented by the elevators was obvious.

II
This court reviews a grant of summary judgment de novo.[3] The trial court's rulings on the admissibility of the evidence offered by Kamla present questions of law, and those rulings are also subject to de novo review.[4]
A. Admissibility of Kamla's Evidence Regarding Space Needle's Control Over the Elevator and the Work
Kamla argues that Gilfillan's alleged hearsay statements constitute substantive evidence and create "a genuine issue of credibility." The trial court correctly ruled that Gilfillan's alleged statements were only admissible for purposes of impeachment under ER 613. Relying on Balise v. Underwood,[5] Kamla argues that such impeachment evidence is sufficient for purposes of summary judgment to create an issue of fact as to whether Space Needle exercised actual control over the elevator. Balise provides:
When, at the hearing on a motion for summary judgment, there is contradictory evidence, or the movant's evidence is impeached, an issue of credibility is present, provided the contradicting or impeaching evidence is not too incredible to be believed by reasonable minds. The court should not at such hearing resolve a genuine issue of credibility, and if such an issue is present the motion should be denied. 6 Moore's Fed. Prac. (2d ed.) ¶ 56.15(4), pp. 2139, 2141; 3 Barron & Holtzoff, Fed. Prac. and Proc. § 1234, p. 134. (Emphasis added).[6]
Balise holds that summary judgment should not be granted even where impeachment evidence relied upon by the plaintiff will not carry the plaintiff's burden of proof at trial.[7]
Balise appears to be inconsistent with more recent cases regarding the proper standard for granting motions for summary judgment. Under Young v. Key Pharmaceuticals, Inc., a defendant who does not have the burden of proof at trial may move for summary judgment based on nothing more than the absence of evidence to support the nonmoving plaintiff's case.[8] Space Needle has not submitted any authority or argument on this issue, and we find that it is unnecessary to determine whether Balise is still good law.
As the trial court noted, it is undisputed that Space Needle was never asked to shut down the elevator. It is also undisputed that Space Needle was in actual control of the elevator at the time of the accident, and that Space Needle knew that the operation of the elevator created an obvious hazard for the Pyro employees on the 200-foot level. Gilfillan's hearsay statement's regarding Space Needle's alleged reluctance to shut down the elevator do not actually contradict or impeach the admissible evidence on any of these key points. As a result, Gilfillan's hearsay statements, even if admissible for purposes of summary judgment, do not create a material issue of fact.
Kamla also argues that Space Needle's control over the work is shown by Spencer's statement that Space Needle "absolutely" retained control. This statement is *466 conclusory because it does not shed any light on the basic facts of how Space Needle actually exercised control or what Space Needle actually did. The trial court correctly held that Spencer's statement is not an assertion of fact, and is not admissible evidence for purposes of CR 56(e), on the issue of whether Space Needle exercised actual control over the work.[9] Moreover, Space Needle concedes that it retained the right to control the building and to enforce safety measures.
Finally, Kamla argues that the trial court erred in ruling that evidence of safety measures taken after the accident was inadmissible under ER 407. Kamla contends this evidence is relevant to the issue of Space Needle's control over safety at the work site. Although the parties have devoted considerable argument to this issue, we find that this issue is immaterial to this appeal because any error in the exclusion of this evidence is clearly harmless.
Space Needle admits that it retained authority to enforce safety measures, that it controlled the elevator at the time of the accident, and that it could have shut down the elevator before Kamla's accident. Evidence that Space Needle took such precautions after the accident does not affect our analysis of the issue of duty because Space Needle's "negligence or culpable conduct" is not relevant to the question of duty.
B. Statutory Duty of Care Under Stute v. P.B.M.C.
Under RCW 49.17.060(2), employers have a duty to comply with WISHA regulations for the safety of employees. In Stute, the supreme court held that general contractors have a non-delegable duty to ensure compliance with all WISHA regulations because:
A general contractor's supervisory authority places the general in the best position to ensure compliance with safety regulations. For this reason, the prime responsibility for safety of all workers should rest on the general contractor.[10]
The Stute duty to enforce safety regulations has been applied to property owners and developers under certain limited circumstances. In Weinert v. Bronco National Co.,[11] an employee of a subcontractor who fell from a defective scaffolding sued the project developer and the main siding subcontractor. There was no evidence that either defendant had participated in the erection of the scaffolding or had any knowledge of defects in the scaffolding. Nevertheless, the court held that both defendants had a duty under Stute to ensure compliance with WISHA regulations. The developer, like a general contractor, had overall supervisory authority and was in the best position to enforce safety regulations.[12] While the siding subcontractor had only limited responsibilities, it had the same supervisory authority as the developer with respect to the siding.[13]
In Doss v. ITT Rayonier, Inc.,[14] the plaintiff's decedent was an employee of an independent contractor hired to clean boilers at the defendant's mill. The employee was killed by a falling piece of slag while he was cleaning a boiler. The defendant required the contractor to comply with all safety regulations, but had assigned its own safety supervisors to the job. Although the defendant's safety supervisor kept a close watch on the cleaning work, he did not insist on the use of safety nets as required by WISHA regulations.[15] The court held that the mill owner owed a duty to the plaintiff to comply with safety regulations. "Rayonier, as the owner of the site, had innate supervisory authority that gave it control over the workplace."[16]
Relying on Weinert and Doss, Kamla argues Space Needle was an owner with supervisory control over the work site, and therefore *467 owed Kamla a duty to ensure compliance with safety regulations.[17]Weinert is distinguishable. The Weinert court noted that "[t]he owner/developer's position is so comparable to that of the general contractor in Stute that the reasons for the holding in Stute apply here."[18] Unlike the owner/developer in Weinert, Space Needle is merely a building owner, and its position is not comparable to that of a general contractor.
Doss is more applicable here. Both this case and Doss involve building owners that hired independent contractors to perform specialized work on or at the building. However, the Doss opinion is based on a determination that the owner's safety inspector actually exercised supervisory control over the work performed by the contractor.[19] Unlike the owner in Doss, the Space Needle did not actually supervise the work being done by Pyro. We decline to extend the holding in Doss to apply where an owner merely retains the right to exercise control over the work of a contractor but does not actually exercise such control.
To the extent Doss holds that mere retention of the right to control the work gives rise to a duty under Stute, we disagree. In Kennedy v. Sea-Land Service, Inc.,[20] this court noted that Doss had rejected the argument that a mere employer of an independent contractor could not be liable under Stute. But this court agreed with Doss only to the extent that the employer of the independent contractor actually exercises the requisite degree of control over the work.[21] Following Kennedy, we hold that Space Needle is not liable under Stute because Space Needle did not actually control the work performed by Pyro.
C. Common Law Duty of Care
The general rule is that the owner of premises owes to the servant of the independent contractor employed to perform work on his premises the duty to avoid endangering him by his own negligence or affirmative act, but owes no duty to protect him from the negligence of his own master.[22]
As set forth above, the first duty owed by Space Needle to Kamla is a duty not to endanger Kamla by Space Needle's own negligence or affirmative acts. A second common law duty may arise under an exception to the general rule of nonliability for the negligence of an independent contractor:
A common law exception to the general rule of nonliability exists where the employer of the independent contractor ... retains control over some part of the work. The [employer] then has a duty, within the scope of that control, to provide a safe place to work.[23]
We will consider each potential duty separately.
(1) Space Needle's Duty to Kamla as an Invitee
Space Needle argues (and the trial court agreed) that the moving elevator was an obviously dangerous condition, and that Space Needle had no duty to correct the condition and no duty to warn invitees of the obvious danger. It is undisputed that the danger was obvious, and that there was no duty to warn. The issue is whether Space Needle also owed Kamla a duty not to endanger *468 Kamla notwithstanding the obviousness of the danger.
Space Needle relies on Hartman v. Port of Seattle,[24] which states: "The duty owed to an invitee is to exercise reasonable care to maintain the premises in a reasonably safe condition, or to warn the invitee of any danger..."[25] Space Needle cites this passage for the proposition that a premises owner may either warn of a dangerous condition or correct the condition, but is not required to do both. If Space Needle were correct, premises owners could subject their invitees to all manner of hazards without liability as long as those hazards are obvious.
But Space Needle's interpretation of Hartman was directly rejected in Thorpe v. Boeing Co.[26]
[T]he proprietor owes [an employee of an independent contractor] the same duty to provide for his safety that it owes to the contractor himself; namely, that he will maintain the premises in a reasonably safe condition ... and will not expose him to hidden dangers ..."[27]
In addition to a duty to warn of hidden dangers, Space Needle owed Kamla a duty of care to keep the premises reasonably safe and to avoid endangering Kamla by its own negligence or affirmative acts.[28] The obviousness of the danger presented by the moving elevator does not relieve Space Needle of its common law duty to avoid endangering Kamla.[29]
Space Needle also argues that there is no evidence that Space Needle breached its duty of care. We disagree. The Space Needle relies on Epperly v. City of Seattle, where the plaintiff was injured by the negligence of the plaintiff's employer, and it was undisputed that the defendant city did not create or control the dangerous instrumentality that caused the accident.[30] In this case, however, the danger of the moving elevator was created and controlled by Space Needle. The danger was known to Space Needle before the accident. A trier of fact could find that Space Needle was negligent in operating the elevators while people were working on the 200-foot level without adequate protection from the moving elevators.
(2) Space Needle's Duty Under the "Retained Control" Exception
In Kelley v. Howard S. Wright Constr. Co., the court held that one who engages an independent contractor may be liable for injuries caused by the work of the contractor where the employer of the contractor retains control over some part of the work.[31] Later cases have clarified that retention of the right to control the work is not enough and that actual control is required.[32] Owners who do not actually control some part of the work are not liable.[33] While Space Needle controlled the elevator, it did not control the actual work being performed by Pyro. Therefore, Space Needle is not liable, under the retained control exception, for any negligence of Pyro.

III
Space Needle owed Kamla a common law duty to avoid endangering Kamla by its own *469 negligence. The trial court erred in holding otherwise.
REVERSED.
COX and KENNEDY, JJ., concur.
NOTES
[1] 114 Wash.2d 454, 788 P.2d 545 (1990).
[2] 110 Wash.2d 355, 359, 753 P.2d 517 (1988).
[3] Daley v. Allstate Ins. Co., 135 Wash.2d 777, 782, 958 P.2d 990 (1998).
[4] A trial court abuses its discretion if its ruling is erroneous as a matter of law. Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 339, 858 P.2d 1054 (1993).
[5] 62 Wash.2d 195, 381 P.2d 966 (1963).
[6] 62 Wash.2d at 200, 381 P.2d 966; see Amend v. Bell, 89 Wash.2d 124, 128-29, 570 P.2d 138 (1977) (impeachment on a collateral matter does not preclude summary judgment); Hays v. Lake, 36 Wash.App. 827, 832, 677 P.2d 792 (1984) (same).
[7] 62 Wash.2d at 200-01, 381 P.2d 966. See 4 Lewis H. Orland & Karl B. Teglund, Washington Practice: Rules Practice § CR 56, n. 8 (5th ed.1992).
[8] 112 Wash.2d 216, 225 n. 1, 770 P.2d 182 (1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).
[9] Grimwood, 110 Wash.2d at 359, 753 P.2d 517.
[10] Stute, 114 Wash.2d at 463, 788 P.2d 545.
[11] 58 Wash.App. 692, 795 P.2d 1167 (1990).
[12] Weinert, 58 Wash.App. at 696, 795 P.2d 1167.
[13] Weinert, 58 Wash.App. at 697, 795 P.2d 1167.
[14] 60 Wash.App. 125, 803 P.2d 4 (1991).
[15] Doss, 60 Wash.App. at 126-27, 803 P.2d 4.
[16] Doss, 60 Wash.App. at 128, 803 P.2d 4.
[17] The issue of whether the unrestricted operation of the elevator through the work area violated WISHA regulations is not before this court. The record indicates that citations were issued based on the operation of the elevator. It appears, with the benefit of hindsight, that the elevator should have been stopped while Pyro employees were working on the 200-foot level. For purposes of summary judgment on the question of duty, we will assume that the unrestricted operation of the elevator through the work area violated WISHA regulations.
[18] 58 Wash.App. at 696, 795 P.2d 1167.
[19] 60 Wash.App. at 126-27, 803 P.2d 4.
[20] 62 Wash.App. 839, 816 P.2d 75 (1991).
[21] Kennedy, 62 Wash.App. at 854, 816 P.2d 75.
[22] Hennig v. Crosby Group, Inc., 116 Wash.2d 131, 133-34, 802 P.2d 790 (1991) (quoting Epperly v. City of Seattle, 65 Wash.2d 777, 785, 399 P.2d 591 (1965)).
[23] Hennig, 116 Wash.2d at 134, 802 P.2d 790 (quoting Kelley v. Howard S. Wright Constr. Co., 90 Wash.2d 323, 330, 582 P.2d 500 (1978)).
[24] 63 Wash.2d 879, 389 P.2d 669 (1964).
[25] 63 Wash.2d at 882, 389 P.2d 669 (emphasis added).
[26] 5 Wash.App. 706, 490 P.2d 448 (1971).
[27] Thorpe, 5 Wash.App. at 708, 490 P.2d 448 (quoting Meyers v. Syndicate Heat & Power Co., 47 Wash. 48, 91 P. 549 (1907)); Winfrey v. Rocket Research Co., 58 Wash.App. 722, 725, 794 P.2d 1300 (1990).
[28] Thorpe, 5 Wash.App. at 708, 490 P.2d 448; Epperly, 65 Wash.2d at 785, 399 P.2d 591; Winfrey, 58 Wash.App. at 725, 794 P.2d 1300.
[29] At oral argument, counsel for Space Needle conceded that the obviousness of the danger did not eliminate Space Needle's common law duty of care to its invitees. A similar concession in the trial court might have resulted in a different ruling.
[30] 65 Wash.2d at 780, 399 P.2d 591.
[31] 90 Wash.2d at 330, 582 P.2d 500.
[32] Smith v. Myers, 90 Wash.App. 89, 96, 950 P.2d 1018 (1998).
[33] Smith, 90 Wash.App. at 96, 950 P.2d 1018; Hennig, 116 Wash.2d at 134, 802 P.2d 790.